*\*Jacob D. Farber, Petitioner, v. Commissioner of Internal Revenue, Respondent*

Jacob D. Farber and Roze Farber, Petitioners, *v.* Commissioner of Internal Revenue, Respondent

Docket Nos. 91341, 91342.  Filed January 7, 1965.

*Herman H. Krekstein, Merle A. Wolfson,* and *Nathan Miller,* for the petitioners.

*Frederick A. Levy,* for the respondent.

Hoyt, *Judge:* Respondent determined deficiencies in and additions to the income tax of petitioner Jacob D. Farber for the calendar year

---

*Findings of Fact and Opinion modified.  Supplemental Opinion appears at 44 T.C. 408.

1948 and of petitioners Jacob D. Farber and Roze Farber for the calendar years 1949 through 1954 in the following amounts:

| Year | Income tax deficiency | Additions to tax | |
|---|---|---|---|
| | | Sec. 293(b), I.R.C. 1939; sec. 6653(b), I.R.C. 1954 | Sec. 294(d), I.R.C. 1939 |
| 1948 | $20,793.00 | $10,396.50 | $1,871.39 |
| 1949 | 87,403.60 | 46,210.21 | 5,621.30 |
| 1950 | 9,212.88 | 4,606.44 | 534.77 |
| 1951 | 44,016.80 | 22,008.40 | 3,922.84 |
| 1952 | 30,720.11 | 15,560.01 | 1,843.21 |
| 1953 | 46,390.76 | 23,195.38 | 3,117.78 |
| 1954 | 29,509.91 | 14,754.96 | 1,602.03 |
| | 268,047.06 | 136,731.90 | 18,513.32 |

One of the cases here decided involves the separate return of Jacob D. Farber for the year 1948. The other case is concerned with the joint returns of Jacob D. Farber and his wife, Roze Farber, for the years 1949 through 1954. The cases have been consolidated for trial, briefing, and opinion. The principal issues for decision are:

(1) Were the understatements of income in petitioners' returns for the years in question due to fraud with intent to evade tax?

(2) If not, are the assessment and collection of the asserted deficiencies barred by limitations?

(3) Is the bank-deposits method used by respondent in determining the amount of each annual deficiency invalid and did it produce excessive deficiencies, or should respondent's determination be sustained?

FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference.

Petitioners Jacob D. Farber and Roze Farber are husband and wife residing in Philadelphia, Pa. Petitioner Jacob D. Farber filed an individual income tax return for the calendar year 1948 with the collector of internal revenue, Philadelphia, Pa. The petitioners filed joint income tax returns with the collector of internal revenue, Philadelphia, Pa., for the calendar years 1949, 1950, and 1951, and with the district director of internal revenue, Philadelphia, Pa., for the calendar years 1952, 1953, and 1954. Notices of deficiency pertaining to all of these years were issued on December 29, 1960. The notices of deficiency for the years 1948 through 1953 were all issued more than 6 years after the returns for those respective years had been filed. The notice of deficiency for the year 1954 was issued less than 6 years but more than 3 years after the date of filing [1] of petitioners' 1954 return.

---

[1] Apr. 15, 1955.

For convenience hereinafter Jacob D. Farber will be referred to as petitioner and Roze Farber will sometimes be referred to as petitioner's wife.

Petitioner was born in approximately 1900. He completed the sixth grade of elementary school and then began working. In 1917 he joined the U.S. Navy, served for almost 2 years, and was then honorably discharged. While in the Navy he worked applying tar to the inside of the bottom of ships. After leaving the Navy, petitioner started a business for the manufacture and sale of bituminous coatings. This business was run as a sole proprietorship and became known as Briggs Bituminous Composition Co. In 1937 petitioner developed a new coating which he called Farbertite and which soon made him successful. Petitioner supervised overall operations of the business during the years 1948 through 1954, including plant operations, sales, delivery, and recordkeeping. He traveled extensively in pursuit of this business during these years.

The sole officeworker employed by the company during the period here in question was Owen Trainer, who served as bookkeeper, secretary, and assistant to petitioner in supervising production employees. Trainer began keeping books and records for the business on a cash basis in approximately 1949. Petitioner maintained a bank account for the business at Liberty Real Estate Bank & Trust Co. (hereinafter referred to as Liberty Bank), and maintained personal accounts at other banks. Petitioner would regularly receive checks representing business receipts as well as income from personal investments (rents, dividends, etc.) at his office, and these checks would be deposited by Trainer in the various accounts maintained by petitioner. Except when absent from the office, petitioner would instruct Trainer as to the specific bank account into which each check should be deposited. Sometimes petitioner instructed Trainer to deposit checks representing proceeds of the business in one of petitioner's personal accounts. Petitioner had also instructed Trainer to record in the records of the business *only* the receipts deposited in the business bank account at Liberty Bank, to turn over to petitioner's accountants only the records that pertained to deposits in the Liberty Bank, and to not mention to the accountants anything about the personal bank accounts. With reasonable regularity during the period in question, amounts previously deposited in petitioner's personal accounts were withdrawn and deposited in the company's account at Liberty Bank. Upon petitioner's instruction, these deposits were treated on the books of the company as loans.

An accountant was hired by petitioner to prepare the profit-and-loss statements of the business and the individual income tax returns of petitioner and his wife for each of the years in question. An associate

of the accountant audited the cash disbursements and receipts of the business, using only the bank statements of Liberty Bank for verification of cash receipts. Upon inquiry every year, petitioner told him that *all* of his business receipts were deposited in the Liberty Bank account. During each of the years in question the company's account at the Liberty Bank reflected deposits in excess of the business receipts shown on the business records. In each year petitioner explained to his accountants that some of the excess was attributable to business borrowings. The remaining unexplained excesses were, with petitioner's concurrence, added by the accountants to business receipts.

Facts, needed in preparation of petitioner's tax returns, concerning income other than from the Briggs Bituminous Composition Co. (i.e., rents, dividends, etc.), were supplied to the accountants personally by petitioner and his wife. The information supplied them by both petitioner and his wife omitted disclosure of certain amounts of taxable income, which amounts were not reported in petitioners' tax returns.

The net income or loss which petitioner reported in his income tax returns for each of the years in question, and specific items of taxable gross income which were never reported, were as follows:

| | 1948 | 1949 | 1950 | 1951 | 1952 | 1953 | 1954 |
|---|---|---|---|---|---|---|---|
| Reported net taxable income (or loss) | ($22,451) | $8,106 | ($11,933) | $84,911 | $8,408 | $24,899 | $1,658 |
| Unreported taxable income: | | | | | | | |
| Business receipts | 38,430 | 120,185 | 2,756 | 38,474 | 36,031 | 44,168 | 47,285 |
| Freight damage claims | | | 188 | 1,217 | 2,003 | 611 | |
| Dividends, interests, and rents | | | | 888 | 674 | 157 | 1,802 |
| | 38,430 | 120,185 | 2,944 | 40,579 | 38,708 | 44,936 | 49,087 |

In addition to the amounts of identified income reflected above, petitioner deposited funds in accounts in his name at the Peoples National Bank & Trust Co., Langhorne, Pa.; the Central Trust Co.,[2] Rochester, N.Y.; and the Central Penn Bank, Philadelphia, Pa., from unidentified sources as follows:

| | | | |
|---|---|---|---|
| 1948 | $27,843 | 1952 | $4,040 |
| 1949 | 17,889 | 1953 | 6,765 |
| 1950 | 35,854 | 1954 | 1,583 |
| 1951 | 12,724 | | |

Petitioner married his present wife, Roze, in the year 1920 when he was about 20 years old and she was about 17. At the time of his mar-

---

[2] This account was in petitioner's own name but under the address of petitioner's brother-in-law.

riage, petitioner was affectionate, ambitious, and firm in his ideas and conduct. He was normal mentally. During the 1930's petitioner was vigorous, keen, and clearminded. He was a normal person who spoke with assurance and would not go off on a tangent.

Beginning approximately in the early 1940's petitioner's personality began to change, and it continued to change from that time through the 1940's and early 1950's. Petitioner became critical of his wife, accused her of infidelity, and while they were residing in the country and had two cars, he sometimes drove one away and took the key to the other with him so that she could not leave the house. He also would accuse her of failing to keep the house in good order and of being cruel to him, and because of some stomach difficulties he was experiencing he often complained about the food that she prepared. At one time when his wife drove him to his place of business and went in with him, he ordered her out. He became hysterical and accused her of wanting to take his business away from him and install her brothers in his place. Upon one occasion, in about 1950, petitioner became uncontrollable and attempted to assault his wife, causing her to flee from the house. Petitioner instituted two divorce proceedings against his wife, the first one being in about 1948; however, petitioner and his wife are still married at the time of this proceeding.

During the 1940's petitioner's behavior patterns also changed and became objectionable in various other respects. He became boastful, highly egotistical, abusive, and argumentative; he frequently made silly and foolish statements, ridiculed his wife in the presence of friends, and acquired an unreal and inappropriate sense of humor. He began to repeat statements or expressions which he felt were humorous with incessant regularity. For example, he constantly referred to his brother-in-law, Harry Fryman, as "Harry Frypan." He invited associates to lunch by asking them if they had $2 to take him to lunch and then wound up by purchasing their lunch. The record contains other examples of this behavior. These comments were interpreted humorously when first used by petitioner but were generally no longer so regarded after he used them to excess. Another example of odd behavior was also related. When visiting his mother at his sister's home in the absence of his sister, petitioner would hide articles of bric-a-brac and place chairs on top of the sofa. He later denied to his sister and brother-in-law that he had done it. This conduct was repeated even though petitioner's sister and brother-in-law indicated that they did not think it was funny. Petitioner often drove an old pickup truck even though he had a new car idle in the garage. To a gradually increasing extent in the late 1940's and early 1950's, petitioner exhibited a tendency to lose the continuity of his thought and his discourse sometimes became disconnected.

Petitioner became antagonistic not only to his wife but to others. He quarreled with various of his brothers and sisters, with his own attorneys, with business associates, and with a bank. In 1958, for example, he requested his accountant to investigate various records in an attempt to prove that the Peoples National Bank was overcharging him $2,000 on a loan.

Although petitioner acted quite normally most of the time, he often exhibited the peculiar and abnormal behavior described. His inappropriate and bizarre conduct had been nonexistent prior to about 1940. The personality and conduct changes occurred from the early 1940's through the early 1950's; they were subtle and gradual but became more pronounced from time to time.

The first sign of illness suffered by petitioner occurred in about 1938 when he had a momentary lapse of consciousness while in the bathroom at his home. The record does not reveal the cause of this fainting spell. Petitioner remained in normal good health without further fainting spells until approximately 1947. In or about 1947 petitioner began to suffer from chronic digestive distress. He began to notice that after a heavy meal or a meal rich in fatty or fried foods he would develop pain, a sense of discomfort and nausea, breathlessness, and the feeling that his chest was expanding. These attacks occurred once every 3 or 4 months and were accompanied by headaches. They were sometimes severe enough to necessitate hospitalization or a house visit by petitioner's doctor. On one occasion while visiting his daughter in Washington, petitioner experienced one of these attacks after a dinner of fried liver. The next morning he passed out for a minute or so. However, it was not until about 1949 that he began to experience weakness or fainting with these attacks, and on the whole record we find that the blackouts were infrequent over the years, not convulsive in nature, and just brief fainting spells. We do not find that the evidence establishes that they could be described as "epileptic fits" or "convulsive seizures."

During the latter part of 1949, petitioner became, at least, partially, impotent and began losing weight. Early in the morning of November 14, 1949, petitioner blacked out for 1 or 2 minutes. Later that day he was admitted to the Jewish Hospital in Philadelphia, where tests were made, and he was released 2 days later with his ailment undiagnosed. In January 1950, petitioner became jaundiced and felt weak. He made five or six visits to a doctor who told him that he was probably suffering from a nervous condition. In February 1950, petitioner took a trip to New Orleans. Still jaundiced and feeling malaise, he went to the Southern Baptist Hospital in New Orleans for a checkup. After several tests and X-rays, he was discharged with a diagnosis of cholelithiasis (gallstones) and in "improved" condition. An X-ray of the skull at that time showed "the posterior

clinoid to be indefinite and small areas of calcification can be seen in the region of the pituitary fossa." This was the first indication in medical records that petitioner might have a tumor of the pituitary gland.

On March 2, 1950, petitioner entered the Lankenau Hospital of Philadelphia, Pa., where his chief complaint upon admission was indigestion. He had lost about 15 pounds since the previous year. The hospital's attention was called to the possible tumor of the pituitary gland, but at that time petitioner's wife indicated to the doctor recording petitioner's medical background that petitioner's memory was good. Petitioner entered the Lankenau Hospital under the medical service of a specialist in internal medicine. The attending physician caused petitioner to be examined by a neuropsychiatrist, a neurosurgeon, and an ophthalmologist. Additional skull X-rays were taken which showed changes "quite consistent with a primary pituitary tumor, most likely a chromophobe adenoma." The X-rays, however, showed no evidence that these changes were causing increased pressure on the brain. The results of the other examinations, while not eliminating the possibility that petitioner had a pituitary tumor, led to the conclusion that if a tumor existed, it caused no ill effect. While at this hospital petitioner underwent an exploratory abdominal operation which showed adhesions around the gallbladder. A small tube was left protruding from his abdomen to permit drainage of the gallbladder. The following "Discharge Note" was entered in petitioner's hospital record on March 29, 1950, the day of his discharge:

Patient discharged [with] T–tube in place and to return within 1 week for removal of gall bladder. His jaundice has nearly completely disappeared and he now feels fine.

At present he has only remaining stones in gall bladder.

No symptoms suggestive of pituitary tumor.

On April 3, 1950, petitioner entered the University of Pennsylvania Hospital in Philadelphia for removal of the drainage tube, and complaining of "gallstones, jaundice, weakness and pain under ribs." Aside from these complaints the hospital was advised that petitioner was known to have a pituitary tumor for which no treatment had been recommended. The only symptom noted in connection with the pituitary tumor was "some loss of libido." The drainage tube was removed and petitioner was discharged without undergoing surgery on April 9, 1950.

Beginning approximately that same year, petitioner's wife noted personality changes [3] in petitioner. He evidenced an "anxiety reac-

---

[3] Although we have already found that petitioner's personality underwent changes throughout the 1940's, petitioner's wife, in the background information given to University of Pennsylvania Graduate Hospital doctors in 1953, reported first noting personality changes "three or four years ago," or in 1949 or 1950. While this inconsistency casts some doubt on our finding that personality changes occurred in the 1940's, we have so found based upon testimony of several disinterested witnesses.

tion" and became more concerned about small things and increasingly more irritable. He experienced more frequent fainting spells. These episodes occurred at no regular intervals and at no particular time of day. He would remain unconscious a few minutes with no convulsive movements, then regain consciousness and complain of feeling weak. Petitioner experienced several of these attacks in the period 1950 through mid-July 1953. In early 1953 petitioner experienced difficulty in seeing lateral objects. On June 11, 1953, he was examined by an endocrinologist who diagnosed a pituitary tumor.[4]

On July 13, 1953, petitioner was admitted to University of Pennsylvania Graduate Hospital, Philadelphia, under the professional care of a neurosurgeon. The following day a left frontoparietal craniotomy was performed and a pituitary tumor about the size of a pigeon's egg (or about an inch and a half in diameter) was discovered. This tumor was bulging out of the cavity which houses the pituitary gland and exerting pressure on the optic nerves, *but not on the brain*. The tumor was partially removed. Three or four days after this operation, infection set in and another operation was performed to evacuate the abscess which had accumulated. Petitioner was partially paralyzed during the convalescent period. On August 19, 1953, he was discharged in satisfactory condition.

Two years later, petitioner was again admitted to the University of Pennsylvania Graduate Hospital complaining of vision defects, constipation, nausea, and vomiting. His history taken at that time gave no additional complaints relating to pituitary tumor. The following day a gallbladder operation was performed which revealed gallstones. Petitioner was discharged from the hospital a week later on August 21, 1955.

During each of the years here in question, petitioner had a tumor of the pituitary gland; however, the tumor never during these years exerted pressure on his brain. Petitioner's hospitalization at Jewish Hospital in 1949, Southern Baptist, Lankenau, and University of Pennsylvania Hospitals in 1950, and University of Pennsylvania Graduate Hospital in 1955, all were occasioned by intestinal and digestive distress, nausea, vomiting, gallbladder difficulties, and/or related ailments. None of these ailments or symptoms was caused by or related to the pituitary tumor; none had any relationship to petitioner's mental condition.

A pituitary tumor is not a mental but a physical disease. Unless it exerts pressure on the brain, it has no direct effect on mental functions.

---

[4] One of the principal indications of a pituitary tumor is visual defect. This is because the pituitary gland is located near the optic nerves and a tumor of the pituitary gland is likely to grow in such a way as to exert pressure on these nerves, thereby causing such defects.

A pituitary tumor, if large enough, can cause endocrine disturbances which may be evidenced by personality and mental changes. Petitioner did not experience significant endocrine changes prior to 1950. During and after 1950 petitioner did experience some endocrine changes caused by his pituitary tumor. While his personality changed somewhat and he demonstrated aggressive behavior and possible indifference about various things, these endocrine changes did not impair his ability to reason logically. Farber was not psychotic and there is no evidence that he ever lost touch with reality.

During the years in question as well as in some earlier years petitioner's friends and business contacts thought that he was somewhat unusual and eccentric. However, he was considered a sound businessman, entertaining, logical, and mentally responsible. He conducted his business operations and ran all phases of a sizable operation almost singlehanded. He was active in civic and charitable affairs. He handled his financial transactions with Liberty Bank in an intelligent, businesslike manner and an officer of that bank even urged him to make out a will.

Petitioner also engaged in the purchase and sale of real estate during the years before us, in some instances making use of a straw party. In 1951 he negotiated the sale of one piece of property for an amount in excess of $250,000 without legal assistance. In 1951 and 1952 he joined with others to purchase the Langhorne Country Club and he kept the records and accounts for this venture. During these years, as well as in the earlier years in question, he also deposited business receipts in his personal bank accounts, instructed his bookkeeper not to tell his accountants about this, and returned these funds to his business in the guise of loans as more funds were needed for business operations.

An investigation of petitioner and his wife was begun by the Internal Revenue Service in approximately March of 1956. At an interview under oath on March 21, 1957, petitioner admitted that business receipts were not all deposited in the Liberty Bank and that he did not inform his accountants about those which were not, but he failed at this time to inform the Internal Revenue Service about his personal bank account in Rochester, N.Y. He contended that the omitted sales proceeds were moneys that came in for products made out of old, inferior materials which were sold without profit or at a loss and that such money did not constitute earnings or income. He persisted in this explanation and repeated it over and over again. When petitioner was requested by the Internal Revenue Service to turn over copies of all sales invoices for the years 1948 to 1954, he intentionally withheld those showing business receipts deposited in accounts other than the Liberty Bank account.

On April 30, 1958, an indictment was returned against petitioner charging him with attempting to evade and defeat his income taxes for the years 1951 through 1954. Petitioner originally entered a plea of not guilty. A plea of "not guilty by reason of insanity" was not entered. His defense counsel in that action testified before us that they could not get a doctor to testify that petitioner did not know the difference between right and wrong during the periods of his tax evasion. Trial began on December 1, 1958, before Judge Clary and a jury in the U.S. District Court for the Eastern District of Pennsylvania. At that time no claim was made that petitioner was incompetent to stand trial. After the first day of trial, petitioner withdrew his plea of not guilty and entered a plea of guilty. On April 3, 1959, the sentence of the court was that the imposition of jail sentence was suspended, petitioner was fined $5,000 and placed on probation for 2 years, a condition of probation being that he promptly move to settle his tax liabilities to the United States.

During the year 1958 petitioner repeated the course of conduct in which he engaged during the years 1948 through 1954. He opened a new bank account into which he deposited some receipts from sales which were not entered on the books. When petitioner's accountant was preparing petitioner's 1958 tax return, he discovered the omission of sales and asked petitioner about them. Petitioner gave the same explanation he had given the Internal Revenue Service for the earlier years—that these were payments for old products which were not sold at a profit and, therefore, the receipts were not income. This course of conduct was repeated by petitioner during 1959 and again in 1960. In all of these instances petitioner told the same story and persisted in it. The accountant disregarded petitioner's explanation and included the amounts involved as gross receipts in the returns. Petitioner signed the corrected returns. At no time during the years before us did petitioner claim to be mentally incompetent; nor were any proceedings ever instituted to have him declared mentally incompetent. No allegation of Farber's mental incapacity was made during those years and he was not found or declared to be mentally incompetent at any time before trial.

Respondent originally determined that the following amounts of deposits in petitioner's personal bank accounts were from unidentified sources and constituted taxable income:

| | | | |
|---|---|---|---|
| 1948 | $31,645 | 1952 | $24,495 |
| 1949 | 17,388 | 1953 | 24,174 |
| 1950 | 35,854 | 1954 | 22,770 |
| 1951 | 25,066 | | |

Prior to trial of the instant cases, the parties met in an attempt to stipulate facts. Based largely upon information emanating from an

informal book kept by petitioner's bookkeeper (which subsequently disappeared) concerning the sources of the above unidentified deposits, the parties agreed to stipulate the following amounts of unexplained bank deposits:

| | | | |
|---|---|---|---|
| 1948 | $27, 843 | 1952 | $4, 040 |
| 1949 | 17, 889 | 1953 | 6, 765 |
| 1950 | 35, 854 | 1954 | 1, 583 |
| 1951 | 12, 724 | | |

The parties also stipulated that certain sales made by petitioner were not entered in his business books and were not included in the figures reflected on his income tax returns, as follows:

| | | | |
|---|---|---|---|
| 1948 | $38, 430 | 1952 | $36, 031 |
| 1949 | 120, 185 | 1953 | 44, 168 |
| 1950 | 2, 756 | 1954 | 47, 285 |
| 1951 | 38, 474 | | |

### FINDINGS OF ULTIMATE FACTS

Petitioner Jacob D. Farber's income tax return for 1948 and petitioners' joint income tax returns for the years 1949 through 1954 were false and fraudulent and filed with intent to evade tax. Part of the deficiency or underpayment of tax for each of those years was due to fraud with intent to evade tax.

During the years 1948 through 1954 petitioner Jacob D. Farber had the mental capacity to file a false or fraudulent return with intent to evade tax.

All deposits made in petitioner Jacob D. Farber's personal bank accounts during the years 1948 through 1954, which were stipulated as income items, and all deposits which were from sources unidentified at the time of trial, represented receipts of taxable income.

### OPINION

The respondent has determined deficiencies and asserted penalties for each of the years 1948 through 1954. The statutory notice of deficiency for each of these years was mailed to the petitioners on December 29, 1960. Petitioner here protests the validity of respondent's action, alleging that respondent is barred from assessing any tax for the years 1948 through 1954 by section 275(a) of the Internal Revenue Code of 1939 and its successor, section 6501(a) of the 1954 Internal Revenue Code,[5] which, with certain exceptions, prohibit assessment of any tax after the expiration of 3 years beyond the date on which the tax return for the year in question was filed. In the

---

[5] Unless otherwise indicated, statutory references hereinafter will be to the Internal Revenue Code of 1954. References to the appropriate sections of the 1939 Code applicable to the years 1948 through 1953, inclusive, will sometimes be incorporated by reference to the successor section in the 1954 Code.

instant case the assessments were made more than 3 years after the returns for each of the years in question were filed.

Respondent contends that the 3-year limit of section 6501(a) is not applicable and that no limitation period applies in the instant case. He relies on the following exception to the general rule of section 6501 (a) :

SEC. 6501(c) (1)[6] FALSE RETURN.—In the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed, or a proceeding in court for collection of such tax may be begun without assessment, at any time.

Respondent asserts that for each of the years in question the petitioners caused to be filed false or fraudulent returns with intent to evade tax, and that such fraud prevents the running of the statute of limitations.[7] This alleged fraud is also made the basis for assessment of the 50-percent addition to tax under sections 293(b) of the 1939 Code and 6653(b) of the 1954 Code.[8] Additions are also asserted pursuant to section 294(d) of the 1939 Code with respect to estimated taxes for each year.

Petitioners, while admitting that they failed to report substantial amounts of business receipts as taxable income, and that the conduct of Farber would be fraudulent if performed by an individual of clear mind and mental capacity, deny that the failure here was due to fraud on the part of Jacob D. Farber *with intent to evade tax*. More particularly, petitioners contend that petitioner Jacob D. Farber, at all times during the years 1948 through 1954 and at the time of the preparation of his income tax returns for said years, was suffering from mental disease or illness, as a result of which he lacked substantial capacity to conform his conduct to the requirements of the internal revenue laws which he is alleged to have violated. It is further averred that his conduct with respect to his tax returns was the product of his diseased mind and that by reason of his mental disease or illness, Jacob D. Farber lacked capacity to be guilty of intentional fraud and could have no intent to defeat or evade tax. Petitioners contend that having produced evidence of Jacob D. Farber's mental illness, respondent has the burden to establish his mental capacity by clear and convincing evidence. These contentions are denied by respondent.

6 Sec. 276(a), I.R.C. 1939.

7 The wording of respondent's pleadings seems to indicate that he is alleging that both petitioners were guilty of fraud. There is some evidence tending to show that Roze Farber intentionally understated her income. However, in his opening statement to the Court at trial, respondent's counsel implied that respondent was relying on the fraud of petitioner Jacob D. Farber, and respondent relies only on Jacob Farber's fraud in his briefs. Hereinafter discussion concerning fraud refers to fraud of Jacob D. Farber, and references to petitioner in the singular refer to petitioner Jacob D. Farber.

8 SEC. 6653(b). FRAUD.—If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. * * *

As an alternative to his contention that no statute of limitations applies to any of the years in question because of petitioner's fraud, respondent contends that a 6-year statute of limitations applies to the year 1954 and that no fraud need be shown to sustain the deficiency in tax [9] as to that year since the assessment was made within the 6-year period. He relies on section 6501(e)(1) of the 1954 Code which, in pertinent part, provides:

(A) GENERAL RULE.—If the taxpayer omits from gross income an amount properly includible therein which is in excess of 25 percent of the amount of gross income stated in the return, the tax may be assessed, or a proceeding in court for the collection of such tax may be begun without assessment, at any time within 6 years after the return was filed. * * *

The applicability of this section has become irrelevant in light of our finding that no statute of limitations is applicable due to petitioner's fraud.

While petitioner's principal contention is that no intentional fraud was committed, they alternatively argue that even if fraud is proved by respondent and no statute of limitations is applicable, the taxes and penalties should not be sustained as assessed since respondent's method of reconstructing unreported business receipts through examination of bank deposits produced a deficiency which was arbitrary and excessive.

We must begin with the central question raised in these cases: Whether petitioner filed false or fraudulent returns with intent to evade tax. Section 7454 places the burden of proving fraud on the respondent, and it must be proven by clear and convincing evidence. *Eagle* v. *Commissioner*, 242 F. 2d 635 (C.A. 5, 1957); *Luerana Pigman*, 31 T.C. 356 (1958); *Arlette Coat Co.*, 14 T.C. 751 (1950). Respondent has presented considerable evidence of substantial weight tending to indicate fraud on the part of petitioner.

Petitioner has stipulated having failed to report substantial amounts of taxable income in each of the years in question, from a minimum of $2,944 in 1950 to as much as $120,185 in 1949. Admitted unreported taxable income for the 7-year period totaled in excess of $334,000. The consistent failure to report substantial amounts of income over a number of years is effective evidence of fraud. *Schwarzkopf* v. *Commissioner*, 246 F. 2d 731 (C.A. 3, 1957), affirming a Memorandum Opinion of this Court; *Rogers* v. *Commissioner*, 111 F. 2d 987 (C.A. 6, 1940), affirming 38 B.T.A. 16 (1938). In fact, this evidence, even by itself, has been regarded as sufficient to satisfy the burden of proving fraud by clear and convincing evidence. See *Kurnick* v. *Com-*

[9] This contention only relates to the question of the running of the statute of limitations. Respondent must still prove fraud in 1954 in order to sustain the 50-percent addition to tax for that year.

*missioner*, 232 F. 2d 678 (C.A. 6, 1956), affirming a Memorandum Opinion of this Court.

Petitioner's manner of keeping business records and reporting to the accountants who prepared his tax returns concealed taxable income and was conduct evidencing petitioner's intention to file false and fraudulent returns. See *Cave* v. *United States*, 159 F. 2d 464 (C.A. 8, 1947), certiorari denied 331 U.S. 847. In addition to his regular business bank account, petitioner maintained three separate personal accounts at different banks in which he deposited business receipts. One of these accounts was out of the State and was listed under the address of a relative. Petitioner would instruct his bookkeeper into which account to deposit checks received. The bookkeeper was instructed by petitioner to record on the books of the business only the receipts deposited in the business bank account; no records were to be kept of business receipts not deposited in the business account. He was further instructed not to reveal that all business receipts were not recorded in the business records. Petitioner concealed from the accountants who prepared his tax returns the fact that substantial amounts of business receipts had not been recorded in the business records from which the returns were to be prepared. Information regarding other income (rents, dividends, capital gains, etc.) was given orally to the accountants by petitioner or his wife, or both. Both petitioner and his wife failed to disclose their dividend, rental, and interest income in full.

Petitioner continued to deposit business receipts in his personal accounts even when the business account was in need of cash for operations. The needed cash was then supplied by transferring funds from one of the personal accounts to the business account and recording the transfer as a loan. Thus the business was kept supplied with funds without their being taxed as business receipts, though they were in fact business receipts. Such a scheme systematically carried out is persuasive evidence of fraud.

During the course of his examination by the Internal Revenue Service, petitioner was requested to turn over copies of his sales invoices. With but few exceptions, he turned over only those invoices, the proceeds of which had been deposited in his business account and recorded in his business records. Information about the proceeds of invoices for sales which were deposited in the personal accounts were withheld from both petitioner's accountants and the Internal Revenue Service. This course of conduct during the investigation of petitioner is cogent evidence of fraud. *Barcott* v. *United States*, 169 F. 2d 929 (C.A. 9, 1948), certiorari denied 336 U.S. 912 (1949).

The petitioner's conviction upon his guilty plea in the criminal action for attempting to evade and defeat his income taxes for the years

1951 through 1954 is also evidence of his fraud for those years. *United States* v. *Wainer*, 211 F. 2d 669 (C.A. 7, 1954). We are not persuaded by petitioner's arguments that we should not consider this evidence because of his poor physical and mental condition at the time of the criminal trial, his now-claimed inability to properly assist in his own defense, and his alleged belief that the resulting conviction, if he entered a guilty plea, would bring a light sentence. We have evaluated this evidence in the light of all of the other evidence before us and in this light it merely confirms what we would have otherwise found without it, that the respondent has proved fraud here.[10]

The evidence thus far discussed appears more than sufficient to meet respondent's burden of proving, by clear and convincing evidence, that false and fraudulent returns were filed for each year before us, and that at least part of the deficiency or underpayment of tax for each year was due to fraud. Indeed we do not understand that petitioners contend otherwise. Instead, petitioners contend that throughout the period in question Jacob Farber's mental condition was such that he did not have the capacity to intend to defraud or to intend to evade tax. Their brief states it this way:

> The fraud relied on by the respondent is alleged to have been committed by the petitioner, Jacob D. Farber. It is not contended by the petitioners that the conduct of Farber, if performed by an individual of clear mind and mental capacity, would not be fraudulent. It is the contention of the petitioners that Jacob D. Farber was suffering from a mental disease by reason of which he did not have the capacity to form the intent requisite to fraud during the period involved.

Relying principally on *Emanuel Hollman*, 38 T.C. 251 (1962), petitioners argue that respondent has the burden of proving petitioner's mental capacity to intend to commit fraud as an essential part of satisfying his general burden of proving by clear and convincing evidence that fraud has been committed. They read the *Hollman* case as holding that the respondent has the burden of proving by clear and convincing evidence that false returns were not the product of mental disease where a taxpayer introduces evidence which might establish his mental illness.

Respondent contends that the *Hollman* case is distinguishable, and argues that petitioner has the burden of establishing his incompetency, relying, *inter alia*, on *Staudt* v. *Commissioner*, 216 F. 2d 610 (C.A. 4, 1954), affirming a Memorandum Opinion of this Court. Respondent also relies on other authorities supporting the well-established rule in

---

[10] This is also some evidence of fraud in the 3 earlier years since we have found as fact that the same course of conduct which gave rise to the criminal charges was originated and engaged in during those years. The same scheme to divert business receipts to personal bank accounts and thus eliminate them from business records and personal tax returns was followed through all the years.

civil cases that a party is presumed sane [11] or competent, and it is incumbent upon the party alleging insanity to prove it.[12]

We regard the case of *Emanuel Hollman, supra,* upon which petitioners rely, as clearly distinguishable on its facts. We need not go into the many details of that case that set it apart from the evidence disclosed by the record before us. We deem it sufficient to note that the evidence there established that the taxpayer was suffering from a severe psychosis; that by reason of that condition his criminal trial had been indefinitely postponed and that a guardian ad litem had been appointed for him to proceed with the case in this Court.

Regardless of where the burden of proof with respect to Farber's mental capacity to commit fraud may be here, the evidence before us is clear and convincing that he filed false returns with full knowledge and mental capacity, and that part of the underpayment or deficiency for each year here involved was due to Farber's conscious fraud with intent to evade tax. Farber was not psychotic in the years here involved; he did not lose touch with reality; no one alleged or contended that he was not mentally competent in those years; and at the time of his criminal trial which occurred several years after the last year with which we are concerned, no claim was made that he was even then unable to stand trial because of his mental condition.

We have considered very carefully the extensive medical evidence, the opinions of experts, and all of the other testimony and evidence in the record before us. On the entire record, we can only conclude that Jacob Farber possessed the mental capacity to commit conscious fraud with intent to evade income taxes in the years 1949 through 1955 when the returns here involved were filed.

We were not impressed with the testimony given by petitioner's wife, Roze Farber, herself a petitioner here. We observed that she was an evasive witness and we conclude that her testimony lacked frankness or candor. We do not regard her testimony as persuasive or reliable, and we think that her history of Jacob Farber's medical difficulties, as given at trial and as related to petitioner's expert witnesses, was inaccurate, inexact, and unreliable. It bore little resemblance to the history set forth in numerous medical and hospital records.

Although there was considerable dispute about the question, we have found that petitioner had a pituitary tumor during and after each of the years in question. The hospital records and other medical evidence before us, however, reveal that it had no effect on petitioner

---

[11] The words "sane," "insane," "sanity," or "insanity" when used herein are not used in their technical sense, but merely as a short form of reference to the presence or absence of the mental capacity to intend to commit fraud.

[12] The rule is otherwise in criminal actions where the accused raises the defense of insanity.

during 1948, 1949, and the first half of 1950. During those years he had already instituted and regularly pursued the fraudulent practices which give rise to the sizable understatement of taxable income here involved. Between mid-1950 and mid-1953 petitioner's tumor grew quite large; he underwent marked changes in personality and he suffered from attacks of fainting. He experienced some endocrine changes and defects in vision. At least some of these occurrences were symptoms of the tumor. However, we do not believe that the tumor at any time during the period in question affected petitioner's mental condition to any appreciable extent. The reasons for this conclusion will be evident below in our discussion of the expert testimony. Thus the medical history, while clearly revealing gallbladder trouble, serious gastrointestinal illness, and pituitary tumor, does not reveal any mental disease or defect such as would prevent petitioner from forming the intent to commit fraud.

The principal evidence presented by both parties on the question of mental capacity consisted of the opinions of expert witnesses. Petitioner brought to the witness stand a neurosurgeon, an endocrinologist, a psychiatrist, and a neuropsychiatrist. Respondent presented the testimony of a psychiatrist (the author of a book on the criminal mind), a neurosurgeon, and neuropsychiatrist. Several of these witnesses had had some contact with petitioner as a patient during the taxable years here in question. Three of them had had no such contact and were called into this case to serve as expert witnesses. First, it must be noted that there is no evidence that any attending physician or qualified medical attendant had *during the period in question* regarded or diagnosed petitioner as having any mental deficiency or derangement. None had treated him for mental illness or disease. None had suggested at any time that he was not mentally competent. Those experts who testified at trial that petitioner had a mental deficiency during the period in question stated this belief not as one which was held during the period in question but as an opinion formed on the basis of data later received or recollected. Much of that data does not coincide with the facts as we have found them.

Of the doctors who had seen or treated petitioner during the period in question, none expressed his opinion of petitioner's mental condition during that period based purely on personal recollection. All of them (as well as the three psychiatrists who had never seen petitioner during the period in question) based their opinions on either recollection refreshed by medical records or on data concerning petitioner's medical history and conduct received before and during trial. Thus an examination of the data on which the experts based their opinions is important.

All of petitioner's experts relied on one or more of the following *purported* facts or propositions:

1. Mental deficiencies can be caused by pressure on the brain, and petitioner's pituitary tumor was exerting pressure on his brain.

2. Mental deterioration can be caused by a continued course of epilepsy, or uncontrolled convulsive seizures, and petitioner had a history of recurring convulsive seizures dating back to 1938, which were probably caused by pituitary tumor.

3. Mental deficiency can be caused by endocrine disturbances, and petitioner's pituitary tumor caused such endocrine disturbances.

Petitioner's own witness, the neurosurgeon, testified that under recognized medical authority, mental deficiencies are "not at all" associated with pituitary tumor, and that his contrary opinion was based entirely on personal experience in treating pituitary tumor patients. This neurosurgeon removed part of petitioner's tumor in 1953. He testified that at the time of that surgery the tumor was not exerting pressure on the brain. Petitioner's two principal winesses, the psychiatrist and neuropsychiatrist, both relied heavily on information furnished to them by petitioner's wife, which was, as we have indicated, inaccurate and not in accord with the facts as we have found them. For example, they relied on her history of uncontrolled convulsive episodes over many years, even though this history conflicts with the hospital and medical records in evidence. We have found as fact that while there is evidence of a few fainting spells in early years, such spells were not convulsive and did not regularly afflict petitioner until 1950; that recurring attacks during and after 1950 were not accompanied by convulsions. Furthermore, the hospital records indicate that the fainting spells were due to gastrointestinal causes, and therefore they had nothing to do with either petitioner's tumor or his mental condition.

The only evidence which we regard as of any substantial weight in linking pituitary tumor to the alleged mental deficiency is the evidence that the tumor caused endocrine disturbance, which in turn had an effect on petitioner's mental state. The expert witnesses for both sides seem to have agreed that endocrine disturbances can cause mental changes, but they differed as to the nature or extent of such changes. Petitioner's medical history shows few, if any, endocrine changes. Up until 1950 the tumor was so small as to have been unlikely to have caused endocrine changes. The hospital records in evidence show that petitioner became impotent and had some loss of libido in 1950. Respondent's experts indicated that there were some endocrine changes, but they were not of such a serious nature as to affect mental condition during the period in controversy. They stated that endocrine deficiencies such as would cause mental changes produce certain physical

characteristics which were not present in petitioner. The testimony at most indicates Farber became lethargic, forgetful, negative, and confabulative to some degree by about 1953, and, of course, to a greater degree in the years thereafter before trial. We are not at all convinced that his illness had developed to such an extent by April 15, 1955, the last date on which any of the returns before us was filed, that he was not aware that the returns were false or that he could not intend thereby to defraud. Cf. *Staudt* v. *Commissioner, supra.* On the contrary, we are convinced that Farber was fully aware of the falsity of the returns and consciously intended thereby to commit fraud.

Thus, it can be seen that, despite the highly adequate qualifications of petitioner's expert witnesses, the weight to be accorded their opinions must be considerably diminished because of their reliance on faulty and inaccurate information from petitioner's wife and the erroneous assumption that petitioner's tumor was causing pressure on the brain. Also, the hindsight nature of the opinions must be kept in mind. There is no question but that Farber was a very sick man by 1962, the year in which these experts saw him and formed their opinions, and that Farber's mental condition had by then deteriorated to a considerable extent. Approximately 7 years had passed since the last return here involved was filed.

Respondent's principal witness, a psychiatrist and medical author, testified that a pituitary tumor does not interfere with mental competence unless it creates pressure on the brain. He recognized that there was no pressure on the brain in this case. Another of respondent's witnesses, a neurosurgeon, testified that a pituitary tumor does not affect thought processes unless it causes malfunction of the endocrine glands, and as already pointed out, the record does not show serious endocrine disturbance in petitioner in the years before us. Respondent's neuropsychiatrist testified that pituitary tumors do not produce a psychosis but may in some cases affect mental initiative, and, as we have mentioned earlier, one of petitioner's own witnesses, the neurosurgeon, testified that recognized medical authority makes no connection at all between pituitary tumor and mental condition.

In addition to respondent's evidence just described, respondent introduced other substantial evidence of conduct on the part of petitioner entirely inconsistent with a deficient mental condition and entirely contradictory to the proposition that petitioner did not have the capacity to commit fraud in the 1948–54 period. During those years, petitioner handled his financial transactions with Liberty Bank in an intelligent, businesslike manner, and an officer of that bank even urged him to make out a will. He was a leader in civic and charitable organizations. Petitioner also engaged in the purchase and sale of real estate, in some instances making use of a straw party. In 1951 he

negotiated the sale of one piece of property for an amount in excess of $250,000 without legal assistance. Except when hospitalized he managed his business competently and successfully throughout the period in question, dealing with customers throughout the United States and even abroad. He would review his prepared tax returns with his accountants, ask intelligent questions concerning the deductibility of certain items, and apparently understand the theory of taxation.

The *manner* in which petitioner proceeded in his failure to report large amounts of taxable income is strong evidence that he had the intent to evade and defeat taxes, and that he had the mental capacity to defraud. He maintained several bank accounts but kept business records which reflected deposits in only one of these accounts and intentionally failed to reveal to his accountants that business receipts had been deposited in other accounts. Each day he would go through the business checks received and determine which were to be deposited in the business account and which in the personal accounts. One of the accounts used for deposit of unrecorded business receipts was in Rochester, N.Y., several hundred miles from petitioner's place of business or residence and was carried under a false address. Petitioner instructed his bookkeeper, the only other person who knew about the unrecorded business receipts, not to disclose information about them to anyone—not even petitioner's accountants. He devised a scheme to keep business receipts in the business without reporting them as income by characterizing them as loans of personal funds. During investigation of the instant matter by the Internal Revenue Service, petitioner not only secreted certain records but instructed his bookkeeper specifically not to turn them over to the investigators.

We cannot believe that all of the above acts are those of an individual who did not have the capacity to intend to evade and defeat tax. If in fact petitioner felt his actions were proper why did he lie to his accountants, and what was the reason for his concealment and secrecy? Petitioner's actions show a consistent competence in the area of tax evasion.

Some evidence of a possible mental deficiency concerning the secreting of business receipts may be found in petitioner's relatively meaningless explanation to justify his conduct, and his continuation of the illegal activity with the same explanation even after investigation by the Internal Revenue Service and conviction for tax evasion. However, the inference that petitioner acted out of some insane delusion or fixation that certain sales were of old, obsolete merchandise and they did not have to be reported is rebutted by his having given an entirely different explanation to numerous others (i.e., that his tax trouble resulted from embezzling activities of his bookkeeper). The

continuation of the illegal activity and the persistence of the same explanation even after criminal conviction is at most an ambiguous circumstance. But when it is considered that this was over 3 years after the last return here involved had been filed and that by then Farber's condition had further deteriorated and taking into consideration all of the other facts and circumstances of record, we must still conclude that petitioner did not lack capacity to intend to defraud when he filed false returns with regularity over the period of years before us.

It should also be noted that we have found that petitioner's tumor was so small in 1948 and 1949 that it did not have any effect on his mental capacity. Yet the tax evasion scheme and secret withholding of income was instituted and put into operation during this time when the tumor had no noticeable effect. The fact that the illegal activity engaged in during 1950 through 1954 was identical to that of 1948 and 1949 tends to indicate that the tumor did not cause the activity in the later years either. In our view, Farber merely carried on the plan and scheme he had devised to evade the payment of income taxes.

The parties have argued, both at the time of trial and on brief, at some length as to the proper test of mental competence to be applied in the instant case. They cite and rely upon various decisions which have recently stirred up considerable controversy in the criminal law field. We have examined and analyzed those cases thoroughly but we deem it unnecessary to adopt or apply any specific rule or formula here. Suffice it to say that in this case whatever criteria might be regarded as controlling in a criminal case, the evidence before us clearly establishes that this petitioner had the mental capacity to intend to commit fraud with respect to his income taxes in the critical period. We hold that for the taxable year 1948 petitioner Jacob D. Farber, and for the taxable years 1949 through 1954 petitioners Jacob D. and Roze Farber, filed false and fraudulent returns with intent to evade tax and that part of the deficiency or underpayment of tax for each year was due to fraud. Hence, no statute of limitations bars respondent from asserting the determined deficiencies, and respondent may impose the 50-percent additions to tax for fraud.

Having determined under sections 276(a) and 6501(c)(1) that *no* statute of limitations is applicable to the years in question, we need not consider respondent's alternative contention that a 6-year statute applies under section 6501(e)(1) to one of the years before us.

There remains for consideration petitioner's challenge of the amount of the deficiencies and the resulting amounts of additions to tax. Part of the deficiencies for each of the years in question was determined by respondent under the bank-deposits method, under which the taxpayer's bank account (or accounts) are examined and all deposits,

the source of which is not explained, are regarded as taxable income. Though petitioner's argument is primarily to the effect that the bank-deposits method produced an excessive deficiency when applied to the years 1948 through 1950, he apparently also raises the general objection that the deposits method is inexact when used for years far in the past, since it imposes on the taxpayer impossible burdens of explanation. To this objection suffice it to say it is certainly more within the competence of the taxpayer to explain his deposits than it is within the competence of the Commissioner to discover their source. The bank-deposits method of determining unreported income has long been accepted by the courts. See, e.g., *Goe* v. *Commissioner*, 198 F. 2d 851 (C.A. 3, 1952), affirming a Memorandum Opinion of this Court, certiorari denied 344 U.S. 897, and cases cited therein.

More specifically, petitioner contends that the deficiencies determined under the bank-deposits method for 1948 through 1950 were arbitrary and excessive. In his investigation of petitioner, respondent had discovered bank deposits during each of the years in question which were from unexplained sources and which respondent regarded as taxable income. Later petitioner produced certain informal records applicable to 1951 through 1954 as a result of which respondent lowered the unidentified deposits for that period by approximately 75 percent. Petitioner now contends that had similar records been available for the earlier years (1948 through 1950), a similar portion of the unidentified deposits for those years would have been identified as from nonincome sources, and that it is therefore a fair and logical inference that a similar portion was in fact from nonincome sources. Even in a fraud case, where the burden of proving fraud is on respondent, petitioner still retains the burden of proving error in the determination of the amount of deficiency. *Max Cohen*, 9 T.C. 1156 (1947), affd. 176 F. 2d 394 (C.A. 10, 1949).

Petitioner relies on the line of cases headed by *Helvering* v. *Taylor*, 293 U.S. 507 (1935), which hold that when a determination of the Commissioner is shown to be arbitrary and excessive, there is no burden on the taxpayer to show the correct amount of tax, and if neither party can show the correct amount then there can be no deficiency. This reliance is misplaced, since it begs the real question whether the determination was in fact arbitrary or excessive. Petitioner's only evidence on this question is that respondent recognized 75 percent of the unexplained deposits as nonincome items in the years for which a record was available. We find this evidence too weak to overcome the presumptive correctness of respondent's deficiency determinations. The change was made in negotiations between the parties prior to trial in an attempt to stipulate facts. The records which petitioner presented pertaining to 1951 through 1954 were highly informal and

there is room for considerable doubt whether they would have been sufficient to actually establish to the Court's satisfaction that 75 percent of the unidentified deposits of 1951 through 1954 were nonincome items. Thus, not only does respondent's stipulation to lower deficiencies in 1951 through 1954 *not* indicate that his original determination of 1948 through 1950 deficiencies was incorrect, but it does not even necessarily indicate that the original deficiencies for 1951 through 1954 were incorrect. Furthermore, the fact that inadequate and incomplete books and records were maintained and that petitioner deposited unreported taxable income in personal bank accounts make the bank-deposits method an entirely reasonable method of reconstructing income in these circumstances. We hold that petitioners have failed to carry their burden of proof to show that any of the deficiencies were incorrect and that, therefore, the deficiencies and additions to tax as determined by respondent (after stipulated adjustments) are sustained. No issue has been raised with respect to the additions to tax under section 294(d) and they therefore are sustained with adjustments to take into account our disposition of the amount of the deficiencies.

*Decisions will be entered under Rule 50.*