Louis L. Staffilino v. Commissioner.
Staffilino v. Comm'r
Docket No. 265-64.
United States Tax Court
T.C. Memo 1966-20; 1966 Tax Ct. Memo LEXIS 263; 25 T.C.M. (CCH) 110; T.C.M. (RIA) 66020; January 25, 1966
*263 Held: 1. That respondent has failed to prove fraud for the years 1954 and 1955 by clear and convincing evidence. 2. That, in absence of fraud or waivers, the deficiencies determined by respondent are barred by the statute of limitations. John Kennedy Lynch, 907 East Ohio Bldg., Cleveland, Ohio, and D. Paul Camilletti, for the petitioner. Gordon B. Cutler and Alan E. Cobb, for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined the following income tax deficiencies and additions to tax against the petitioner: Additions to Tax
Year
Deficiency
Sec. 6653(b) [1]
1954
$3,272.36
$1,636.18
1955
6,722.14
3,361.07
*264 The principal issue for decision is whether any portion of any deficiency determined by respondent in income tax for the years 1954 and 1955 is due to fraud. A subsidiary, but related, issue is whether the assessment and collection of the deficiencies determined by respondent for such years are barred by the statute of limitations. Findings of Fact Some of the facts have been stipulated and the stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Louis L. Staffilino (hereafter sometimes referred to as petitioner) resides in Mingo Junction, Ohio. He timely filed his Federal income tax returns for the years 1954 and 1955 with the district director of internal revenue, Cleveland, Ohio. Petitioner's parents, Rose and Guiseppe Staffilino (hereafter sometimes referred to as Rose and Guiseppe), were married in 1917 in Steubenville, Ohio, shortly after immigrating from Italy. They lived their entire married life in Mingo Junction. Except for sporadic short layoffs, Guiseppe worked continuously from 1909 until about *265 two years before his death in 1959. His work included employment as a millwright, part of the time as a foreman, with the Carnegie-Illinois Steel Corporation (Mingo Works) from January 9, 1909 to September 8, 1945, and employment with Steel Service, Inc. (The Berkman Company), from August 19, 1946 to June 10, 1957. When Rose and Guiseppe married they had already saved $1,100. They set up housekeeping in a home for which they paid $10 a month rent and immediately took in six boarders. With Guiseppe's pay and the rent paid by the boarders the Staffilinos were able to save between $50 and $100 a month. This pattern of saving continued throughout their married life. They lived frugally, worked hard, and as their earnings increased, so did their savings. Petitioner's older brother, Fred Staffilino, was born on December 5, 1917, and petitioner was born on December 30, 1918. They were the only two Staffilino children. By 1921 the Staffilinos had saved at least $12,500 and took a trip to Italy to see their family during a temporary shutdown of the steel mill. Guiseppe stayed for a short period of time, until the mill reopened, while the rest of his family stayed for approximately one year. *266 During this period the boarders remained and paid rent. Rose and her two sons, without Guiseppe, made another trip to Italy in 1930. At this time Rose was still taking in boarders. Guiseppe had inherited one-half of a large house in Italy and while Rose was there she bought the other half of the house from Guiseppe's brother for $3,000. By this time the Staffilinos had saved approximately $20,000. The house in Italy produced rental income until it was sold. Shortly after her second return from Italy, Rose invested $10,000 in the purchase of 200,000 Italian lire. She did not make any money on this investment. At some subsequent time Rose and Guiseppe received several inheritances from relatives in Italy. From about 1932 to May 1946, Rose operated a grocery store in the family home which was located in the steel mill workers' area of Mingo Junction. This store was open from approximately 6 o'clock in the morning to 11 o'clock at night, 7 days a week. There was infrequent hired help. The store was operated by Rose with the assistance of Guiseppe (during the hours he was not working at the steel mill) and her two sons. On May 4, 1946, the steel company, which was purchasing all the property *267 in the area, purchased Rose's property. She was paid $7,000 for the premises and $2,000 for the grocery business. During the depression several of the banks in which the Staffilinos had money on deposit closed temporarily. Although Rose and Guiseppe recovered 90 percent of their money, they lost some of their faith in banks. It was also during this period that the Staffilinos received an extortion note from the Maffia. The Staffilinos, because of their consistent bank deposits and real estate transactions, had gained the reputation of being well-to-do. Although they never paid any money to the Maffia, the Staffilinos, fearing recurrences of this sort of thing, became even further afraid of depositing substantial sums of money in banks. However, they did maintain bank accounts. Rose at all times managed the cash for the family. She kept the cash in a box from which she paid the store expenses and the family expenses. Several months after the steel company purchased the Staffilino's property at 229 Cleveland Avenue, the family moved to 603 St. Clair Street. At that time Rose had accumulated approximately $35,000 in her money box. Guiseppe received a pension from the Carnegie-Illinois *268 Steel Corporation from 1945 until he reached age 65 in 1953 and became eligible for Social Security. However, Guiseppe chose to work until 1957 rather than collect Social Security, but he received Social Security payments from 1957 until his death in 1959. Rose and Guiseppe made the following purchases of real estate, all in Mingo Junction, Ohio, paying cash with no mortgage loans: December 20, 1939, 229 Cleveland Avenue, cost approximately $1,000; April 10, 1946, 707 St. Clair Street, cost approximately $12,000; November 14, 1947, 668 Commercial Street, cost approximately $5,500; June 12, 1946, 603 St. Clair Street, cost approximately $8,600. In the latter part of 1955 they built a residence on the rear of their property at 603 St. Clair Street which cost approximately $10,000. Rose and Guiseppe sold the following real estate in Mingo Junction, Ohio: March 7, 1941, rear house and land, 229 Cleveland Avenue, sale price $1,000; May 2, 1946, front portion of real estate at 229 Cleveland Avenue (to the steel corporation), sale price $9,000. The Staffilino family was close-knit and the parents were very generous to their sons. The boys received frequent gifts from their mother and *269 father, often sums of money. Rose and Guiseppe also purchased several automobiles for each of their sons. When Fred married in 1942 they gave him money and furniture. They also gave him a home rent free at 707 St. Clair Street. Guiseppe and Rose made the following stock transactions as recorded in the Securities Register books in the Mingo National Bank: Shares
Shares
Date
Name of Stockholder
Name of Stock
Bought
Sold
Amount
1- 8-51
Joseph Staffilino
Wheeling Steel
100
$3,680.65
8-24-51
Joseph Staffilino
Wheeling Steel
100
4,194.77
12-19-51
Joseph Staffilino
Wheeling Steel
100
3,781.15
2-23-53
Joseph Staffilino
Penn. Railroad
100
1,787.75
10-11-52
Rose Staffilino
Wheeling Steel
10
352.55
9-18-53
Rose Staffilino
Wheeling Steel
10
321.55
4-14-54
Joseph Staffilino
U.S. Steel
48
2,117.26
11-23-54
Joseph & Rose Staffilino
Wheeling Steel
120
5,636.75
6- 7-55
Rose Staffilino
Wheeling Steel
100
5,528.54
11-22-55
Rose Staffilino
Wheeling Steel
Rights
110
58.33
7-16-59
Rose Staffilino
Wheeling Steel
110
6,941.12
3- 5-60
Rose Staffilino
Wheeling Steel
125
6,432.25 In *270 addition, from the time they were married and for a number of years thereafter, Rose and Guiseppe bought one share of Carnegie-Illinois Steel Corporation stock each month. Petitioner graduated from Mingo Junction high school in 1938 at which time he was awarded several football scholarships. He accepted one at the University of Chattanooga but became homesick and returned to Mingo Junction after 6 weeks. A year later he went to the University of Kentucky but again returned home after a short time. Petitioner then went to work at the Carnegie-Illinois steel mill as a laborer. He worked there sporadically until the end of 1945, except for about one year of service in the United States Army from which he was honorably discharged because of an old knee injury. Petitioner worked in Rose's store part time while working for the steel mill and full time from the end of 1944 until the steel mill purchased the store in 1946. Petitioner did not receive a regular salary from Rose but received varying sums of money from her at frequent intervals. For the next 3 years petitioner was not regularly employed although he did some professional boxing. During this period he continued to live with his *271 parents who provided for him generously. In these years, petitioner spent substantial time collecting some $16,000 in debts owed to Rose by people to whom she had extended credit when operating her grocery store. All of the money was turned over to Rose. Rose and Guiseppe had promised petitioner he would eventually receive a large share of these collections. In 1950 petitioner opened a variety store, known as Lane's Lounge, at 668 Commercial Street, Mingo Junction, selling cigars, cigarettes, candy, stationery, and other sundries. The building at that time was owned by Rose and Guiseppe, having been purchased by them in 1947. Prior to petitioner's occupation of the premises, Rose and Guiseppe realized rental income from the building. Petitioner was not required to pay rent to his parents for the use of this property. In 1954 petitioner had one pinball machine operating in his store and in 1955 he had two. In 1954 and 1955 petitioner also had in his store a Western Union sporting events ticker tape and a blackboard listing current sporting events. On October 24, 1954, Rose and Guiseppe conveyed title to the property at 668 Commercial Street to petitioner. For several years prior to *272 1954 his parents had told petitioner that the store would eventually be his. During the years 1954 and 1955, Hugh Longo maintained the books and records for petitioner's store. He would pick up all invoices, tapes from the cash register, and the record from the pinball machine receipts and enter them in a ledger. In addition, Longo was given paid bills and other receipts. Longo prepared petitioner's 1954 and 1955 income tax returns. On his returns for the years 1954 through 1959 the petitioner reported from his business the following gross receipts and cost of goods sold: 1954
1955
1956
1957
1958
1959
Gross Receipts
$14,826.21
$16,667.69
$21,153.39
$27,563.81
Sale of Mdse.
$14,953.83
$14,680.79
Wagering Income
6,317.90
5,612.00
Pinball Machine
11,661.00
13,076.00
$14,826.21
$16,667.69
$21,153.39
$27,563.81
$32,932.73
$33,368.79
Cost of Goods Sold
$ 6,591.55
$ 7,662.45
$ 9,436.31
$ 8,948.83
$ 8,064.03
$10,138.86
For the years 1954 and 1955 the gross receipts listed above included all income from wagering and pinball machines. Additionally, on Schedule H of his 1956 return he reported $2,500 *273 "games of chance" income; and on Schedule H of his 1957 return he reported $2,056.45 "wagering" income. In 1945 petitioner married Nancy Patterson. The couple lived with Rose and Guiseppe in their home, paying no rent. All food for petitioner's family was provided by Rose and Guiseppe as well as some clothing for the children. This situation continued into 1955 when Rose and Guiseppe moved into a new home they had built on the rear of their property at 603 St. Clair Street. They left petitioner and his family to live in the older house on the front of the same lot. Rose and Guiseppe continued to give petitioner's family free rent and food. During 1954 and 1955 petitioner's living expenses did not exceed $1,500 annually. On October 19, 1953, savings account No. XXXX was opened in the OhioValley Savings and Loan Company (hereafter referred as the Ohio Valley Bank) in Steubenville, Ohio, in the name of petitioner. His signature is the only one that appears on the signature card for that account. The initial deposit was $1,500. During 1954 and 1955 deposits totaling $9,570 and $7,700, respectively, were made in this account. On September 25, 1954, petitioner was requested by Guiseppe *274 to drive him to the Ohio Valley Bank. Upon arriving there Guiseppe told the cashier that he wanted $1,000 and thereupon a withdrawal slip was given to petitioner by Guiseppe to sign to authorize the withdrawal of that sum from account No. XXXX. Petitioner signed the slip and Guiseppe was given $1,000 by the bank clerk. Guiseppe used the money to pay for storm windows for the family home. All deposits made to savings account No. XXXX in the Ohio Valley Bank were made by Rose and Guiseppe for petitioner. It was the intention of the Staffilinos to amass approximately $25,000 in this account for the benefit of petitioner. On March 7, 1950, petitioner opened a safe deposit box in the Mingo National Bank. In September 1954, petitioner had approximately $11,000 in cash in the box which he had accumulated from the earnings and gifts from his parents. On September 20, 1954, petitioner entered the box and removed all of the cash, planning to use it to pay for the partial demolition and reconstruction of his store located at 668 Commercial Street. Petitioner, about the time he withdrew the cash from his safe deposit box, removed a safe from his store to his home and placed the cash in it. *275 When the store improvement was delayed, the petitioner began to deposit the cash in his checking account during 1955. Some of the cash remained in the safe after the store was reconstructed and was then kept in the safe at the store. This money was used to cash customers' checks which were then deposited in his bank accounts. The existing store building was partially demolished during 1955 and reconstructed at a cost of about $7,000. During 1955 petitioner deposited $15,536.69 in his checking account at the Mingo National Bank of which at least $8,300 came from cash removed from his safe deposit box on September 20, 1954. Approximately $7,000 of this money was used to pay for the reconstruction of the store building. On November 23, 1954, petitioner opened savings account No. X7225 in The Steubenville Building and Loan Association Company in Steubenville, Ohio. In 1954 petitioner made $8,650 in deposits in this account and no withdrawals. In 1955 petitioner made $5,695.58 in deposits in the same account and withdrew $3,000. On January 3, 1952, petitioner opened savings account No. XXXX in the Mingo National Bank. He made no deposits or withdrawals in 1954 and 1955 except that *276 on September 20, 1955, the account balance of $5,050.12 was withdrawn, the account closed, and the money redeposited in his checking account in the same bank on the same day. Prior to 1960 the petitioner or his wife redeemed the following United States savings bonds: Date
Issue
Redemption
Owner
Redeemed
Date
Value
Wife
1-20-48
11/47
$ 75.00
Petitioner
9-11-52
11/51
18.75
750.00
750.00
750.00
750.00
1/51
380.00
380.00
760.00
On January 29, 1962, in the United States District Court for the Northern District of Ohio, Eastern Division, in the case of United States v. Louis L. Staffilino, Criminal Case. No. 23650, the petitioner was aquitted of charges of wilfully and knowingly attempting to evade and defeat a large part of his income taxes due and owing by him to the United States for the taxable years 1954 and 1955, pursuant to the granting of his motion for judgment of acquittal. Respondent's notice of deficiency was mailed to petitioner on November 15, 1963. Petitioner did not sign any waivers extending the period for assessment or collection of the deficiencies determined by respondent for the *277 years 1954 and 1955. Ultimate Findings 1. No part of each deficiency determined by respondent for the taxable years 1954 and 1955 is due to fraud with intent to evade tax. 2. In the absence of fraud or waivers extending the period for assessment and collection, the assessment and collection of any deficiencies for the years 1954 and 1955 are barred under the provisions of section 6501(a). Opinion Respondent determined deficiencies in petitioner's income tax for 1954 and 1955 by reconstructing his income on the "bank deposits and cash expenditures" method. This reconstruction the respondent justifies on the ground that petitioner's books and records were inadequate and inconsistent with his income. Moreover, respondent asserts that petitioner substantially understated his income for 1954 and 1955; that there were no sources of nontaxable income to which the alleged unreported income could be attributed; that there were likely taxable sources; and that such understatements were due to fraud. Petitioner, on the other hand, maintains that he has proven sources of substantial nontaxable income and that, in the absence of proof of fraud, the statute of limitations bars the assessment *278 and collection of any income tax deficiencies for the years in controversy. The burden of proving fraud is upon the respondent, section 7454(a), and it must be established by clear and convincing evidence. Arlette Coat Co., 14 T.C. 751 (1950); W. A. Shaw, 27 T.C. 561 (1956), affd. 252 F. 2d 681 (C.A. 6, 1958); and Emanuel Hollman, 38 T.C. 251, 260 (1962). It is necessary for respondent to show that petitioner's income tax returns for 1954 and 1955 were false and fraudulent with intent to evade tax. Denny York, 24 T.C. 742, 743 (1955). A failure to overcome the presumptive correctness of a deficiency cannot be regarded as proof of fraud. Driebourg v. Commissioner, 225 F. 2d 216 (C.A. 6, 1955). Likewise, a failure of proof cannot be substituted for the evidence necessary to sustain respondent's affirmative burden. Luerana Pigman, 31 T.C. 356 (1958); Jacob D. Farber, 43 T.C. 407, 419 (1965), on appeal (C.A. 3, November 11, 1965). Respondent contends that the sums of money deposited in petitioner's bank accounts and other sums allegedly spent by him represented income taxable *279 to him in 1954 and 1955. Throughout the trial respondent endeavored to show a likely source of unreported income by attempting to prove that petitioner engaged in substantial gambling activities in those years. While he succeeded to some extent in creating an air of suspicion as to petitioner's activities in 1954 and 1955, we cannot transmute mere suspicion into hard fact or, for that matter, into even reasonably believable circumstantial evidence. Here, as in many "fraud" cases where there is no direct evidence that petitioner failed to report all of his income, respondent has resorted to an indirect means to prove unreported income. In doing so, he has utilized what is commonly known as the "bank deposits and expenditures" method. Since we have found that petitioner's personal living expenses were no higher than he claimed, thus substantially eliminating the expenditure side of the computation, we limit our discussion to the bank deposits. As in the case of net worth increases, Holland v. United States, 348 U.S. 121, 137 (1954), respondent must introduce evidence to support the claim that bank deposits are attributable to current taxable income. Bank deposits, Denny York, supra, *280 and Goe v. Commissioner, 198 F. 2d 851, 852 (C.A. 3, 1952), like net worth increases, Holland v. United States, supra, pp. 137-8, standing alone, do not prove current taxable income. Furthermore, respondent has neither negated all reasonably likely sources of nontaxable income nor established a likely source from which the bank deposits came. See Holland v. United States, supra, as explained in United States v. Massei, 355 U.S. 595 (1958). *
In this case respondent has attempted to establish gambling activities as the likely source of income but has not done so to our satisfaction. The variety store and pinball machines were unable to generate the sums we are concerned with here. In fact, we find no specific instances of omitted income. In view of the conflicting evidence as to the adequacy of petitioner's business records, the propriety of using the "bank deposits and expenditures" method to reconstruct income is at least doubtful under these particular circumstances. Respondent *281 also tried to negate the sources of nontaxable income claimed by petitioner but we are unable to conclude, on this record, that he has done so. Certainly the weight of the evidence convinces us that the parents of petitioner were the source of most, if not all, of the sums respondent questions. From the evidence presented we must decide this issue on the failure to carry the requisite burden of proof. Accordingly, respondent's determination of fraud is not sustained. There being no fraud and no waivers extending the 3-year period provided by section 6501(a) for the assessment of a deficiency, we hold that the assessment and collection of the income tax deficiencies determined by respondent are barred by the statute of limitations. Decision will be entered for the petitioner. Footnotes
1. All section references herein will be to the Internal Revenue Code of 1954 unless otherwise indicated.↩
*. This sentence was substituted for the one previously appearing at this point by official Tax Court Order dated 2/15/66 and signed by Judge Dawson.↩