Sylvester W. Sargeant and Mildred Sargeant Whitford v. Commissioner.
Sargeant v. Commissioner
Docket No. 2118-65.
United States Tax Court
T.C. Memo 1967-255; 1967 Tax Ct. Memo LEXIS 3; 26 T.C.M. (CCH) 1313; T.C.M. (RIA) 67255; December 27, 1967
Ralph R. Bailey, for petitioner Sylvester W. Sargeant. Martin J. Howard, for petitioner Mildred Sargeant Whitford. Walter John Howard, Jr., for the respondent. DAWSON
Memorandum Findings of Fact and Opinion DAWSON, Judge: Respondent determined that the petitioners are liable for the following income tax deficiencies and additions to tax: Addition to Tax
Sec. 6653(b),
Year
Deficiency
I.R.C. 1954
1958
$1,085.75
$ 542.88
1959
1,816.49
908.25
1960
$7,451.65
$3,725.83
1961
3,379.65
1,689.83
1962
3,240.65
1,620.33
*4 The only issue for decision is whether the respondent correctly determined, on the net worth and cash expenditures method of reconstructing income, that petitioners understated their income for the years 1958 through 1962. The parties agree that the answer to this question depends upon how much cash the petitioners had on hand as of January 1, 1958. Petitioners have conceded that the additions to tax under section 6653(b), Internal Revenue Code of 1954, [1] are to be imposed on any deficiencies determined by the Court to be due for each of the years in issue. [2] Petitioners also concede each of the items appearing in respondent's net worth analysis except for the cash accumulated by petitioners prior to 1958 and which was on hand as of January 1, 1958. Respondent concedes that the petitioners had accumulated cash on hand as of January 1, 1958, in the amount of $7,500 which belonged to Rudolph P. Dierickx and was spent in the year 1960 to purchase a residence for Dierickx at 722 Pine Street, Hood River, Oregon. *5 Findings of Fact Some of the facts have been stipulated by the parties. The stipulations of facts and the exhibits attached thereto are incorporated herein by this reference. Sylvester W. Sargeant and Mildred Sargeant (herein called Sylvester and Mildred individually or petitioners collectively) were husband and wife during the years 1958 through 1962. They both had legal residences in Portland, Oregon, at the time the petition in this proceeding was filed. They filed their joint Federal income tax returns for the years 1958 through 1962 with the district director of internal revenue at Portland, Oregon. Petitioners were married in 1943. Sylvester was then 44 years of age. It was his first marriage. Mildred had been married and divorced twice and was 32 years old in 1943. She had married August Dierickx in 1931 and had one son, Rudolph P. Dierickx, born in 1932. She married Clarence Whitford in 1936 and had no children by such marriage. Petitioners had one son, Gerald Leroy Sargeant, born in 1944. Petitioners were divorced on August 6, 1966, in Portland, and Mildred took the name Mildred Sargeant Whitford. During some part of each of the years in issue Mildred derived substantial *6 income from prostitution. Such income was not reported on their original joint income tax returns for the years 1958, 1959, 1960 or 1961. However, they did report net income of $3,572.84 from such source in their joint income tax return for 1962. After respondent's agents began their examination and investigation of petitioners' income tax liabilities, petitioners filed amended tax returns for the years 1959, 1960, and 1961 on which they reported interest income and additional income of $1,500 from "gratuities" and showed a "penalty under Sec. 6653, I.R.C." Second amended returns for those years were filed by the petitioners on April 16, 1963, which set forth the same amount of interest income as the first amended returns plus $1,500 income from "entertaining" in each year. They also reported self-employment tax liability for the years 1959, 1960 and 1961. This additional income, as reported in their first and second amended returns, was not reported in their original income tax returns for those years. Respondent determined the unreported income of petitioners for the years 1958 through 1962 by the net worth and cash expenditures method. The petitioners have *7 stipulated and agreed that each of the items appearing therein are correct, except that they contend the net worth statement does not include the property in the form of cash prior to 1958 and on hand as of January 1, 1958. These stipulated statements are as follows: ANALYSIS OF NET WORTH INCREASES
1957
1958
1959
1960
1961
1962
Cash and uncashed pay checks
$ 2,500.00
$ 2,500.00
$ 2,500.00
$ 2,500.00
$ 2,500.00
Cash in banks - savings accounts: U.S. National - Head Office
$ 3,720.45
4,695.77
4,977.26
257.98
172.43
3.93
U.S. National - Stadium
Branch
2,758.47
Oregon Mutual Savings
#26168
9,782.80
10,078.64
10,388.24
10,218.87
9,308.22
7,748.72
Oregon Mutual Savings
#39371
$ 2,642.65
$ 2,826.38
$ 2,671.47
$ 6,302.33
$ 6,610.86
Southern Oregon State Bank
#2190, Grants Pass, Oregon
3,963.03
4,082.82
5,115.49
5,321.38
Investments: U.S. Savings Bonds - Series
E
$26,662.50
26,662.50
26,662.50
39,356.25
40,856.25
40,856.25
Automobiles (at cost).
1955 Model 300 Chrysler
3,500.00
3,500.00
1957 Cadillac
6,009.23
6,009.23
6,009.23
6,009.23
6,009.23
6,009.23
1959 Chrysler Imperial
7,162.00
7,162.00
7,162.00
7,162.00
1959 Corvette
3,350.00
1961 Corvette
4,188.00
4,188.00
Real Estate Investments: Residence - 722 Pine Street,
Hood River, Oregon
12,503.69
12,503.69
12,503.69
Improvements & additions by
L. C. Baldwin Construction
Co.
7,066.33
10,700.04
Loans Receivable.
Arthur Nashif (Judgment)
3,000.00
Isadore Winkelman Estates
(note and claim filed)
2,750.00
Total assets and net worth
$49,674.98
$56,088.79
$64,488.64
$88,112.31
$101,183.97
$112,112.57
Less prior years ending net worth
49,674.98
56,088.79
64,488.64
88,112.31
101,183.97
Increases in net worth
$ 6,413.81
$ 8,399.85
$23,623.67
$ 13,071.66
$ 10,928.60
*8 ANALYSIS OF ADJUSTMENTS TO NET WORTH INCREASES
1958
1959
1960
1961
1962
ADDITIONS: Income Taxes Paid: Withheld from salaries and wages
$ 923.42
$ 966.46
$ 996.12
$1,004.00
$ 1,199.56
Additional paid with returns filed
37.85
22.26
20.90
Deposited with Internal Revenue Service
1,947.54
Listed Deductions on Returns Filed: Contributions
462.00
294.00
232.00
257.00
152.00
Taxes (other than income)
67.50
75.00
86.00
388.12
500.20
Medical expenses paid (prior to limitation)
588.00
655.01
599.00
536.25
533.55
Miscellaneous deductions
137.50
107.00
110.00
115.00
1,199.00
Rent paid on residential apartment
339.13
914.21
902.85
894.89
Legal Expenses Paid (criminal defense): Attorneys fees
75.00
100.00
50.00
Fines
50.00
300.00
100.00
Loss in investments - automobiles
850.00
350.00
Utilities paid - N. W. Bell Telephone Co.
39.12
97.76
110.19
111.38
83.16
Insurance Premiums Paid: Massachusetts Mutual Life Insurance Co.
335.34
335.34
335.34
335.34
335.34
John Hancock Life Insurance Co.
179.77
179.77
179.77
State Farm Mutual Automobile Insurance Co.
50.19
52.50
317.66
648.94
111.60
Appliance Purchases: Warren C. Edwards - "A-1" Jewelers
75.00
75.00
75.00
75.00
Winkelmans (electronic equipment)
350.00
Estimated Living Expenses: Automobile expense (based on gas tax claimed
on returns)
411.60
449.10
450.60
733.10
914.00
Food, clothing, miscellaneous expenses based
on $50 per month per person in household
1,800.00
1,800.00
1,800.00
1,800.00
1,400.00
Furnished by taxpayers (per their statements)
to son and daughter-in-law (after marriage)
for 8-month period at $250 per month
2,000.00
Total additions
$4,889.67
$6,221.30
$6,643.74
$7,609.01
$11,821.51
SUBTRACTIONS: Adjusted gross income reported on returns
$6,342.17
$6,926.74
$6,914.26
$6,976.25
$11,264.14
Federal and state income tax refunds
254.38
145.00
48.32
Insurance proceeds (auto accident)
1,130.00
Total Subtractions
$6,596.55
$7,071.74
$6,914.26
$8,106.25
$11,312.46
*9 On January 1, 1958, petitioners had cash on hand in the amount of $7,500 which belonged to their son, Rudolph P. Dierickx. Along with $5,000 in funds withdrawn from savings, the petitioners used the $7,500 in 1960 to purchase property at 722 Pine Street, Hood River, Oregon, for Rudolph P. Dierickx. Sylvester began working in 1914 and was employed as a teamster and farm laborer from that time until 1922. From August 1922 to his retirement in October 1963, Sylvester worked with a right of way maintenance crew for the Southern Pacific Railroad Company, first as a member and later as a foreman of the signal systems maintenance crew. Sylvester was paid either 51 or 53 cents per hour when first employed by the railroad and worked 8 to 10 hours per day, five days a week. Computed on the basis of a 53 cent per hour wage for 50 hours per week, he would have been paid $530 for working 20 weeks in 1922 and $1,378 for the year 1923. His earnings for subsequent years, based on either Southern Pacific Railroad Company's records or his own estimates where no records were available, were as follows: Federal
State
With-
With-
hold-
hold-
ing
ing
Year
Total Wages
Tax
Tax
1924
$ 1,262.29
1925
1,359.70
1926
1,590.90
1927
1,703.71
1928
1,771.82
1929
1,787.78
1930
1,727.68
1931
1,055.15
Subtotal
(1924-1931)
$ 12,259.03
1932
1,700.00
1933
1,700.00
1934
1,700.00
1935
1,700.00
1936
1,048.00
1937
1,685.00
1938
1,827.50
1939
1,989.65
1940
2,154.00
1941
2,472.51
1942
3,000.00
Subtotal
(1932-1942)
$ 20,976.66
1943
3,707.76
1944
3,859.68
1945
3,786.81
1946
3,703.72
$ 278.50
1947
3,445.88
259.90
1948
4,321.44
282.20
$ 43.20
1949
$ 4,554.94
$ 281.73
$ 45.56
1950
4,496.66
349.61
44.92
1951
4,250.79
457.50
42.50
Subtotal
(1943-1951)
$ 36,127.68
$1,909.44
$176.18
1952
5,103.85
617.56
51.04
1953
6,241.49
845.06
31.75
1954
6,179.16
749.36
61.77
1955
5,516.29
630.02
37.20
1956
5,947.65
692.58
74.66
1957
6,015.69
719.93
154.00
Subtotal
(1952-1957)
$ 35,004.13
$4,254.51
$410.42
Grand Totals
$104,367.50
$6,163.95
$586.60
*10 The Federal income tax liabilities of petitioners for the years 1943 through 1945 were as follows: Year
Federal tax
1943
$ 396.87
1944
387.00
1945
356.00
Total
$1,139.87
Under the Railroad Retirement Act of 1937, the following amounts were withheld from Sylvester's salary for railroad retirement: Years
Total amount
1937-1942
$ 364.30
1943-1957
3,001.50
Total 1937-1957
$3,365.80
1958-1962
1,312.40
Total 1937-1962
$4,678.20
Byron Sargeant (hereinafter called Byron), Sylvester's father, began growing strawberries in 1913. He sold his original tract in 1917 or 1918 for about $3,000 and then grew strawberries on a 9 or 10 acre farm near Riddle, Oregon. Byron later gave this farm to Sylvester who sold it for $1,250 in 1941 or 1942. Sylvester claimed Byron as a dependent on his Oregon income tax returns for the years 1937 through 1941. On his Oregon income tax return for 1937, Sylvester stated that his father had no other means of support, was unable to work, had no income of his own, and owned no property. Byron lived with other relatives during most of 1942, 1943 and 1944. On December 1, 1944, he was admitted to the Douglas County *11 Nursing Home with the consent of Sylvester's sister. He died there on February 15, 1946. Byron had no money in 1944. In the period from 1914 to 1922, Sylvester lived with his father on the farm in Riddle, Oregon. From 1922 to 1941, he lived both with Byron on the farm and in a railroad "outfit car" provided by the Southern Pacific Railroad Company. In 1941 or 1942, he moved into a separate outfit car adjacent to his work; and he lived there until his retirement in 1963. Mildred was on public welfare when Sylvester first met her and also just prior to their marriage. She lived in the outfit car, with exceptions later noted, from 1943 through 1957. Petitioner's son, Gerald LeRoy Sargeant, attended schools in Portland, Oregon, at various times through 1956. He attended the Lincoln High School there from September 1958 to June 1962. From August 8, 1958, to August 14, 1959, Mildred resided at the Stadium Court Apartments in Portland, and from August 14, 1959, to 1963 she resided at the Teasdale Apartments in that city. She also rented rooms in several hotels in Portland for considerable periods of time between October 1958 and November 1963 where she engaged in prostitution. Mildred *12 was present in Portland for four months in 1958, 10 months in 1959, 11 months in 1960 and in 1961, and 12 months in 1962. Sylvester did not reside with her but visited her about one weekend each month. On their joint income tax return filed with the State of Oregon for the year 1949 the petitioners claimed a casualty loss of $500 for clothing, luggage and personal belongings destroyed by fire. On October 14, 1949, Mildred was arrested under the name of Mildred Whitford for shoplifting four shirts valued at $23.96 from a department store. Three days later she pleaded guilty to the crime of "Larceny from Store" and was given a 90-day suspended sentence. In their joint income tax return filed with the State of Oregon for the year 1954 petitioners claimed a deduction for a theft loss in the amount of $1,000. In response to a request of the State Tax Commission, Sylvester listed the articles stolen, their costs and values, as follows: Bulova wrist watch
$ 97.00
Man's diamond ring - value $650 -
Cost
400.00
Clock
15.00
New Schick razor
$ 28.75
Boy's new air rifle
22.00
Lady's diamond ring - value much
more - Cost
185.00
Philco radio
55.00
Man's cashmere overcoat
150.00
Cashmere sweaters 2 - socks - ciga-
rettes - trousers - food - money be-
tween $5 and $10 change & flash-
light - in all
70.00
Total
$1,022.75
*13 On October 2, 1954, Mildred was arrested in Portland on a charge of larceny from a store. The arresting officer's report stated that she had taken two jars of jelly worth $1.18. When arrested, she told a policewoman that the $200 in her possession belonged to her son who was then going to college, that she had no money of her own, that this was the reason she stole, and that she was hungry. On October 26, 1954, she pleaded guilty and was convicted of the crime of petty larceny. She received a 90-day suspended sentence. When Mildred was suspected of prostitution in 1956, her son, Gerald LeRoy, was taken into custody at the Juvenile Home. Such action was based on a petition signed by a policewoman of the Women's Protective Division of the Portland Police Department which alleged that Gerald had an unfit home because of depravity by his mother. A counselor at Multnomah County Juvenile Court interviewed Mildred and Sylvester. Sylvester told the counselor that he had already been informed of Mildred's prostitution activities and was shocked and surprised, but that he had been shocked and surprised before by other things she had done in the past. He further stated that while he only *14 earned $300 a month, they managed to save $25,000, mostly in investments and securities. Sylvester also told the counselor that he wondered about some of the jewelry which Mildred purchased, but assumed they were paid for from their savings. Mildred admitted being engaged in prostitution, and the counselor left to petitioners the matter of discussing this with Gerald LeRoy. During the years following their marriage, Sylvester allowed Mildred to handle most of the family finances. Mildred cashed most of Sylvester's pay checks and took responsibility for the money coming from them. On August 4, 1951, the petitioners opened a safety deposit box at the United States National Bank, Portland, Oregon, in their joint names. The two initial entries in August 1951 were made by Sylvester. All subsequent entries to the box through July 3, 1963, were made by Mildred. There were 2 such entries in 1958, 7 in 1959, 5 in 1960, none in 1961, and 4 in 1962. On November 14 and 15, 1963, respondent's agents took an inventory of the United States savings bonds purchased by petitioners. A summary of the total face amount and total cost of such bonds for the period 1942 through 1961 is set forth below: *15 Face Amount
Year
of Bond
Cost
1942
$ 175.00
$ 131.25
1943
325.00
243.75
1944
325.00
243.75
1945
225.00
168.75
1951
21,000.00
15,750.00
1953
7,200.00
5,400.00
1954
6,300.00
4,725.00
1960
16,925.00
12,693.75
1961
2,000.00
1,500.00
Totals
$54,475.00
$40,856.25
The funds used to purchase the 21 United States savings bonds acquired in 1951 came from the following sources: Withdrawn from savings account,
Bank of California 7-2-51
$ 4,992.82
Withdrawn from savings account,
First National Bank 7-28-51
4,991.77
Withdrawn from savings account,
U.S. National Bank 7-28-51
3,900.00
Withdrawn from savings account,
U.S. National Bank 7-30-51
367.00
Withdrawn from savings account,
U.S. National Bank 9-28-51
400.00
Cash on hand expended in 1951
for bonds
1,098.41
Total amount expended
$15,750.00
The funds used to acquire United States savings bonds in 1953 came from the following sources: Withdrawn from savings account,
U.S. National Bank 1-13-53
$ 3,100.00
Cash on hand experded in 1953
for bonds
2,300.00
Total amount expended
$ 5,400.00
The funds used to acquire United States savings *16 bonds in 1954 came from the following sources: Withdrawn from savings account,
U.S. National Bank 6-30-54
$ 3,675.00
Cash on hand expended in 1954
for bonds
1,050.00
Total amount expended
$ 4,725.00
On April 9, 1965, Mildred was charged in the United States District Court for the District of Oregon, in an information filed by the United States Attorney, with two counts of violation of section 7201 of the Internal Revenue Code of 1954, alleging that she did knowingly and wilfully attempt to evade and defeat a large part of the income taxes due and owing by her and Sylvester by filing and causing to be filed false and fraudulent joint Federal income tax returns on their behalf for the years 1960 and 1961. On April 9, 1965, Mildred entered a plea of guilty before Gus J. Solomon, Judge of the United States District Court for the District of Oregon, to both counts in the information. She was sentenced and imprisoned for a term of 60 days on the first count and given a suspended sentence on the second count which placed her on probation for a period of three years. On January 11, 1966, Sylvester was charged in the United States District *17 Court for the District of Oregon, in an indictment returned by the Federal Grand Jury, with five counts of violation of section 7206(1) of the Internal Revenue Code of 1954, alleging that he did wilfully and knowingly make and subscribe a joint Federal income tax return for himself and his wife for each of the calendar years 1958 to 1962, inclusive, which was verified by written declaration that it was made under the penalties of perjury. This indictment was dismissed without prosecution on September 14, 1966, by order of Gus J. Solomon, Judge of the United States District Court for the District of Oregon. Ultimate Finding of Fact On January 1, 1958, the petitioners had the amount of $17,500 cash on hand which had been accumulated in prior years, first in a box kept in the outfit car and later in their safety deposit box. Opinion We are confronted in this case with a narrow factual controversy which had been resolved by our ultimate finding of fact. The deficiencies here determined by respondent were calculated by the so-called net worth method of reconstructing income. Holland v. United States, 348 U.S. 121 (1954); and Lipsitz v. Commissioner, 220 F. 2d 871 *18 (C.A. 4, 1955), affirming 21 T.C. 917 (1954). Petitioners agree in every respect with the net worth statement except opening cash on hand, and have so stipulated. But they sharply dispute respondent's determination of the amount of cash they had on hand as of January 1, 1958. Respondent contends that they had only $7,500 at that time. Petitioners assert that they had a "cash hoard" of $43,000. We are unable to agree with either. Like so many cases of this type, where the factual issue can usually be resolved much more satisfactorily by agreement of the parties, we cannot, after considering conflicting evidence and testimony, accept the position urged by either party. There is, of course, support in this record for respondent's contention and he had made out a rather logical case for his position. He has also fortified that position with evidence tending to show that the petitioners could not have accumulated the substantial sum of $43,000 which they claim to have had on hand on January 1, 1958. However, we are convinced by other evidence that respondent's position is not entirely realistic. We think petitioners did have more than $7,500 but certainly not such a highly *19 inflated amount as $43,000. Therefore we have not made either the finding requested by respondent or the finding requested by petitioners because neither would be in accord with our appraisal of the facts. Using our best judgment, based on all the evidence, we have found that petitioners had $17,500 cash on hand as of January 1, 1958. Cf. Cohan v. Commissioner, 39 F. 2d 540, 544 (C.A. 2, 1930). See also Baumgardner v. Commissioner, 251 F. 2d 311 (C.A. 9, 1957), affirming a Memorandum Opinion of this Court; Michael Potson, 22 T.C. 912 (1954), affirmed sub. nom. Bodoglau v. Commissioner, 230 F. 2d 336 (C.A. 7, 1956); and Abraham Galant, 26 T.C. 354 (1956). While respondent has the burden of proving fraud for all the years in controversy, [3] the petitioners have the burden of proving that the basic deficiencies determined by respondent are erroneous. Cf. Louis Halle, 7 T.C. 245 (1946), affd. 175 F. 2d 500 (C.A. 2, 1949), certiorari denied 338 U.S. 949; Cefalu v. Commissioner, 276 F. 2d 122 (C.A. 5, 1960); Jacob D. Farber, 43 T.C. 407 (1965); and Abraham Galant, supra. *20 Despite this, petitioners have argued that respondent has the burden of proving the cash on hand on January 1, 1958, for purposes of determining the income tax deficiencies as well as the fraud penalty. We need not, and do not, decide who has this burden since our ultimate finding as to the amount of cash on hand on that date reflects our careful examination of all the evidence in this record. See Baumgardner v. Commissioner, supra at pages 318-321. As indicated in our findings of fact, Sylvester's highest annual earnings prior to 1958 were $6,241.49, and his average annual earnings were much less. Although Sylvester and his family may have lived frugally and had few expenses while residing in the railway outfit car, we view as incredulous the contention that the living expenses, including food, clothing, and entertainment, averaged but $300 a year for the period from 1922 to 1942 and $1,800 in the years 1943 through 1957. During many of the years after 1943 Sylvester *21 was supporting a wife and children. He dressed well; he drove good automobiles; and the objects for which he claimed a theft loss on the Oregon income tax return for the year 1954 reflect an appreciation of some relatively expensive luxury items. Moreover, in addition to the alleged "cash hoard," petitioners amassed $26,000 in savings bonds and $13,000 in savings accounts prior to January 1, 1958. To accept Sylvester's claim that he and Mildred also accumulated $43,000 in cash, we would have to find that he saved about 70 percent of his average gross salary of $3,100 per annum for the period from 1924 through 1957. On this record we cannot make such a finding. It is true that two persons testified that they saw cash in a box in the petitioners' possession; but they did not count the money and could not testify as to how much cash the petitioners had in the box. Mildred did not testify as to the alleged cash hoard, and we are left with only Sylvester's uncorroborated testimony that there was $43,000 in the box. We observed Sylvester on the witness stand and, as reflected by our findings of fact, we do not have complete confidence in his credibility. Sylvester has attempted to show *22 the source of the alleged $43,000 cash hoard; and both parties have presented evidence with respect to specific items included in it. Respondent has conceded that the petitioners had $7,500 on hand as of January 1, 1958, which was earned by and held for Rudolph Dierickx. However, we cannot find from the evidence that any of the other items were specifically a part of petitioners' cash on hand as of January 1, 1958. For example, Sylvester testified that he received $1,000 from the Southern Pacific for running a railroad commissary during the years 1942 to 1945; that he received $1,920 from August Dierickx as support payments for Rudolph; and that he received $6,000 in gifts from Clarence Whitford, Mildred's second husband. Even if these amounts were received, the only evidence that they were added to the claimed "cash hoard" is Sylvester's own self-serving and sometimes unreliable testimony. Mildred was not called to testify with regard to the alleged support payments; and there is no proof that the alleged support payments, gifts, or commissary payments were segregated from other funds of the petitioners. Indeed, the fact that Mildred was receiving welfare aid immediately prior to *23 her marriage to Sylvester casts considerable doubt on the ability of her former husbands to make such payments and on her willingness to save such amounts even if they were actually received by her. As to the alleged gifts of $11,250 to Sylvester from his father, Byron Sargeant, the evidence shows that Byron never earned much money from his berry farm, that Sylvester claimed him as a dependent on his Oregon income tax returns from 1937 through 1941, and that Byron died in poverty in the county home a few years later. While Byron did give his farm to Sylvester and Sylvester later sold it for $1,250, the only evidence of the alleged $10,000 gift, besides Sylvester's own testimony, is a statement by Willis Love that Byron told him about such gift. This is insufficient to show that such a gift was actually made. And again, even granting that such a gift was made, there is no evidence to establish that the money was saved and included in the "cash hoard." Petitioners are somewhat critical of respondent for making no effort to call Mildred as a witness. As we see it, respondent had no responsibility to call Mildred, a petitioner in this proceeding, as a hostile witness to testify concerning *24 her prostitution activities, her entries into the safety deposit box after 1951, and her handling of the family finances. Since it had already been established that Mildred was a prostitute and had pleaded guilty to the criminal charge of income tax evasion, there was no risk involved except her inability to support Sylvester's testimony of accumulated cash on hand as of January 1, 1958. Mildred handled the family finances during the years 1951 to 1958, and she was the only one who entered the safety deposit box. Moreover, we note that in 1954 Mildred told a policewoman that she had no money of her own except for $200 which belonged to her son in college. Hence the inference urged by petitioners that each entry to the safety deposit box represented a deposit rather than a withdrawal is unwarranted. Although there is no evidence to show that any particular funds were part of the "cash hoard" claimed by petitioners, we nevertheless believe, as previously found, that they did have cash on hand in excess of the $7,500 held in trust for Rudolph Dierickx. This belief is supported by testimony of others who claim to have seen the box holding some money and also by the petitioners' habits *25 of frugality and amassing savings. To reiterate, we hold that the petitioners had a total of $17,500 cash on hand on January 1, 1958, including the $7,500 they kept for Rudolph Dierickx. To reflect the concessions made by the parties and the conclusion reached on the disputed issue, Decision will be entered under Rule 50. Footnotes
1. All statutory references herein are to the Internal Revenue Code of 1954 unless otherwise specified. ↩
2. Petitioners concede that the year 1958 is not barred by the statute of limitations and agree that they executed timely consents for the taxable years 1959 and 1960 extending the statute of limitations to June 30, 1965.↩
3. This burden has been met by petitioners' concession that additions to tax under section 6653(b)↩ are to be imposed on any deficiencies determined by the Court to be due for the years 1958 through 1962.