ROBERT C. MOOR and BETTY R. MOOR, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent DELMARVA AMUSEMENT SERVICES, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Moor v. Commissioner
Docket Nos. 731-69, 732-69.
United States Tax Court
T.C. Memo 1973-204; 1973 Tax Ct. Memo LEXIS 84; 32 T.C.M. (CCH) 947; T.C.M. (RIA) 73204; September 13, 1973, Filed *84 (1) P was an active partner in Eastern Shore, which computed its income in accordance with the bank deposits method of accounting. A substantial portion of the gross receipts of Eastern Shore were regularly placed in personal checking accounts of P; however, the records of such accounts were not provided to the accountant who prepared the Federal income tax returns for Eastern Shore for 1957 and 1958, and were not considered by the accountant who prepared the return for 1959. In the years 1957, 1958, and 1959, P often had his personal obligations and expenses paid by others or paid with undeposited funds. P "drank" heavily in those years and claims that he relied upon others to compute his income and taxes. Held, part of the underpayment of tax in each of the years 1957, 1958, and 1959 was due to fraud. 2 (2) P owned 100 percent of the stock in Delmarva, which failed to report a substantial part of the income earned during its first year of operation. Held, the respondent has not demonstrated fraud by clear and convincing evidence. Peter Warren Green, for the petitioners. Albert J. O'Connor, for the respondent. SIMPSON
MEMORANDUM FINDINGS OF FACT AND OPINION SIMPSON, Judge: The respondent determined the following deficiencies in, and additions to, the Federal income taxes of the petitioners: Petitioner
Year
Deficiency [1]
Sec. 6653 (b) Addition Robert C. and
1957
$22,184.26
$11,092.13
Betty R. Moor
1958
15,563.44
7,781.72
1959
9,302.20
4,651.10
1960
2,730.98
1,365.49
Delmarva Amusement Services, Inc.
1958 (ending Oct. 31)
$10,000.31
5,000.16
*86 The respondent has conceded that the petitioner, Betty R. Moor, owes no deficiency in income taxes or addition to tax for the years at issue, and he has also conceded the 3 year 1960 with respect to the petitioner, Robert C. Moor. The parties have agreed on the computation of the amount of the deficiencies. Thus, the only issue for decision is whether any part of the underpayments of tax for the years 1957, 1958, and 1959 by Mr. Moor, and for its 1958 fiscal year by Delmarva Amusement Services, Inc., was due to fraud. FINDINGS OF FACT Some of the facts have been stipulated, and those facts are so found. The petitioners, Robert C. Moor and Betty R. Moor, are husband and wife. They maintained their residence in Middletown, Delaware, at the time their petition was filed in this case. They filed their Federal income tax returns for the calendar years 1957, 1958, 1959, and 1960 with the district director of internal revenue, Wilmington, Delaware. During such period, they maintained their books and records in accordance with the cash method of accounting. The petitioner, Delmarva Amusement Services, *87 Inc. (Delmarva), was a corporation organized and existing under the laws of Delaware, with its principal place of business at Pocomoke City, Maryland. It filed its Federal 4 corporate income tax return for the taxable year ended October 31, 1958, with the district director of internal revenue, Baltimore, Maryland. Mr. Moor was an active partner in Eastern Shore Amusement Service (Eastern Shore) during the years 1957 through 1960. Eastern Shore owned and serviced coin-operated music devices located in diners and bars, and Mr. Moor performed the actual servicing of such devices and made collections. It was not unusual for Mr. Moor to continue working until late in the evening. With the exception of two capital transactions, all of the income reported by Mr. Moor during the years 1957 through 1960 was attributed to his interest in Eastern Shore. Eastern Shore maintained its records and computed its income during the period at issue in accordance with the bank deposit method of accounting. Under such method, gross receipts were determined by adding cash expenditures to bank deposits and adjusting for nonincome items. The records of Eastern Shore were maintained in its office *88 in Middletown, Delaware. During this period, certain bills were paid for by cash or by money order paid for by cash at the direction of Mr. Moor, and the receipts were kept in the office at Middletown. 5 Mr. Moor had not graduated from high school and had no knowledge of accounting. After an earlier audit, he was advised by an agent of the respondent to engage an adequate bookkeeper. Accordingly, a part-time bookkeeper, who had previously been a collection officer for the respondent, was engaged to maintain the records of Eastern Shore and to assist in preparing its Federal income tax returns. The part-time bookkeeper also operated a tavern and liquor store owned jointly with Mr. Moor. The bookkeeper spent most of his time operating the tavern and allocated, at most, one afternoon per week to recording expenditures on the books. For 1957 and 1958, Mr. Moor engaged an outside accountant, who was deceased at the time of the trial of this case, to prepare the Federal income tax returns for himself and for Eastern Shore. The accountant's worksheets, from which the returns for 1957 and 1958 were prepared, were based on information provided by Mr. Moor's bookkeeper. Such worksheets *89 indicate that in 1957 Eastern Shore had bank deposits of $149,913.89 and net cash payroll of $30,715.89, and that in 1958 it had bank deposits of $159,702.66 and net cash payroll of $27,487.41. In determining the bank deposits, the accountant was provided with information indicating that only one account 6 was maintained by Eastern Shore, a partnership account at Delaware Trust Company (Delaware Trust account). He was not told about the instances in which cash receipts or money orders purchased with such receipts were used to pay the obligations or expenses of Mr. Moor. Based on the income reported by Eastern Shore, Mr. Moor reported adjusted gross income of $11,916.67 in 1957 and $13,607.65 in 1958. The return for the year 1957 was filed on October 14, 1958, and the return for 1958 was filed on September 25, 1959. Mr. Moor replaced his bookkeeper in 1959 or 1960, and the returns for each of such years were prepared by an accountant who succeeded the bookkeeper. For 1959, Mr. Moor reported adjusted gross income of $23,046.61, which included gain recognized on the sale of Ye Olde Drawyer's Tavern; and for 1960, Mr. Moor reported adjusted gross income of $15,339.94, which *90 reflected a transaction in which a capital loss was recognized. The return for 1959 indicates that it was signed on April 18, 1960, and the return for 1960 was filed on May 2, 1961. In addition to the Delaware Trust account, Eastern Shore also maintained a checking account at the Bank of Delaware, Odessa, Delaware (Odessa account). The actual deposits in the two accounts maintained by Eastern Shore during the years 1957 and 1958 were: 7 1957
1958 Delaware Trust account
$155,417.71
$157,910.15
Odessa account
42,775.31
37,870.81
Total deposits
$198,193.02
$195,780.96
The Odessa account was used in part for the payroll, which was in fact paid by check, and in part to pay for delinquent tax payments of Mr. Moor. On March 20, 1957, Eastern Shore drew its check on the Odessa account to the order of the State Tax Department for $913.25 for the payment of the income tax liability of Mr. Moor for the year 1955. Also in March 1957, Eastern Shore drew its check for $3,000.00 on the same account payable to the Internal Revenue Service for Mr. Moor's 1956 estimated income tax. In 1958, Eastern Shore drew 18 checks on the Odessa account, each in the *91 amount of $500.00, payable to the Internal Revenue Service for Mr. Moor's delinquent income taxes for the year 1947 and interest attributable thereto. In addition to his interest in Eastern Shore, Mr. Moor also was involved in other corporations, partnerships, and proprietorships during the period 1957 through 1960, and such involvement is described in the following table: 8 Name of Entity
Business Activity
Interest
Year Ye Old Drawyer's Tavern, Inc.
Retail sale of alcoholic beverages
Mr. Moor, Pres. & stockholder
1957-1959
Appoquinimink Stables, Inc.
Breed, train and race horses
Mr. Moor, Vice Pres.
1957-1960
Sussex Amusement Service, Inc.
Coin-operated musical devices in and around Sussex and Kent Counties, Delaware
Mr. Moor, Pres.; Mrs. Moor, Vice Pres.
1957
Augustine Beach Hotel, Inc.
Operate hotel at Augustine Beach, Port Penn, Delaware
Mrs. Moor, Secy.-Treas.; Mr. Moor, stockholder
1957-1960
Eastern Shore Amusement Service, Inc. (changed to Delmarva Amusement Service, Inc., on or about Dec. 1957)
Coin-operated music devices
Mr. Moor, Pres. & dir.; Mrs. Moor, dir. & Vice Pres.; Richard G. Stone, Secy. & dir.
1957-1960
Cigarette Service Corporation
Sale of cigarettes
Mr. Moor, Pres.-Treas.-Dir.; Mrs. Moor, Sec.-Dir.; R. Cooper Moor, Jr., Vice Pres.
1958-1960
Universal Amusement & Music (corporation)
Operate coin machines
Mr. Moor, Pres. & stockholder; Mrs. Moor, Vice Pres.
1959-1960 9
Eastern Shore Realty Co. (corporation)
Purchase and sale of real estate
Mr. Moor, Pres.
1960
Florida Amusement & Cigarette Service (partnership)
Coin-operated music devices
Mr. Moor, partner
1960
Ocean City Cigarette Service (joint venture)
Operated cigarette machines in vicinity of Ocean City, Md. from Memorial Day to Labor Day
Mr. Moor, 1/3 interest in 1958; 1/2 interest in 1959-1960
1958-1960
Universal Amusement & Music Service (proprietorship)
Operate coin machines; phonographs placed at locations
2-month period ending 12/31/58
Eastern Shore Ice Service (proprietorship)
Sale of ice vending machines
1959-1960
Coastal Cigarette Service (proprietorship)
Sale of cigarettes through coin-operated vending machines
1959-1960
*92 10 In point of fact, the adjusted gross income as reported in Mr. Moor's returns for the years 1957 through 1959 was understated. During the years at issue, Mr. and Mrs. Moor maintained 9 checking accounts in 7 banks under their own individual names, or in conjunction with other entities, such as Eastern Shore or Eastern Shore Ice Service. The deposits in these accounts amounted to $53,692.96 in 1957, $49,564.58 in 1958, and $57,427.44 in 1959. A schedule of the deposits and disbursements indicates that most of such accounts were active during 1957, 1958, and 1959: 11 Schedule of Deposits
Schedule of Disbursements (including checks and debit memos) Bank
Account
1957
1958
1959
1957
1958
1959 Delaware Trust Company Middletown, Delaware
R. Cooper Moor
3
1
--
2
1
--
Delaware Trust Company Middletown, Delaware
Mrs. R. C. Moor
12
16
5
44
67
32
The First National Bank North East, Maryland
R. C. Moor, Sr.
52
51
49
29
39
34
The Millington Bank of Maryland Millington, Maryland
Eastern Shore - R. C. Moor
27
24
26
8
10
21
The Clayton Bank & Trust Company
Betty Reihm
Betty R. Moor
no activity
no activity
The Sussex Trust Company Rehoboth Beach Delaware
R. C. Moor, Sr.
1
--
--
--
--
--
Sussex Trust Company Rehoboth Beach Delaware
Mrs. Robert C. Moor
--
4
1
--
22
17
Farmer's Bank Wilmington Delaware
R. C. Moor, Sr., trading as Eastern Shore
27
26
20
8
5
11
Farmer's Bank Newark, Delaware
Eastern Shore Ice Service
--
--
21
--
--
18
*93 12 The deposits in these accounts were, in part, derived from the business receipts of Eastern Shore, and the monthly statements of at least 3 of the accounts were mailed to, and kept at, its offices. Cash comprised a large portion of the deposits, and substantial balances were maintained in the principal accounts. Not all of the deposits, however, were attributable to the receipt of income. Certain deposits came from nonincome sources, such as refunds, loans and repayments, and adjustments for mistaken deposits; others were attributable to prior cash withdrawals available for redeposit; and a portion was derived from certain nontaxable cash transactions involving race horses. Such deposits from nonincome sources amounted to $24,714.15 in 1957, $24,123.50 in 1958, and $23,439.22 in 1959. In addition, certain items constituted reductions of bank deposits. Such items amounted to $6,683.33 in 1957, $3,956.25 in 1958, and $9,460.99 in 1959. No other reductions existed; neither Mr. Moor nor Mrs. Moor received an inheritance during this period. Mr. Moor made certain expenditures during the years at issue either by cash or money order purchased with cash or from a source other *94 than one of the nine checking 13 accounts. Such expenditures amounted to $24,129.19 in 1957, $3,972.55 in 1958, and $4,934.70 in 1959. In 1957, Mr. Moor owned a race horse, quartered in New England. Because of a prior gambling arrest, he was prohibited from obtaining an owner's license, and therefore, legal title to such horse was taken in the name of a friend. In October 1957, the friend received a check in the amount of $5,870.00, representing net winnings of the horse, and on October 25, 1957, he wrote a check for the same amount to Mr. Moor. That check was deposited in Mr. Moor's Delaware Trust account, and his total deposits for the year 1957 reflect such transaction. The friend reported the winnings on his return, and Mr. Moor reimbursed him for the additional income tax attributable to such winnings. On December 7, 1957, the friend received a check in the amount of $3,155.00, which represented additional net winnings of the horse. Mr. Moor gave his friend a check for $845.00 and in return received a check for $4,000.00 on December 18, 1957. That check was invested in a real estate transaction and has been included in the computation of Mr. Moor's income as a cash *95 investment by him. On May 3, 1958, Mr. Moor purchased a used 1958 Porsche for Cigarette Service Corporation. The total purchase price was $2,762.89, of which the downpayment was 14 $954.25. Mr. Moor drew a check for the downpayment on May 2, 1958, from his account at the First National Bank, North East, Maryland, and financed the remainder through the Wilmington Trust Company, Wilmington, Delaware. On September 29, 1958, the seller repurchased the automobile for $2,600.00, paid the balance of $1,236.30 due to the Wilmington Trust Company, and gave Mr. Moor a check for the difference of $1,363.70. Mr. Moor endorsed the latter check to Delaware Motor Sales to be applied to the purchase of a 1959 Cadillac by his wife. Cigarette Service Corporation made 5 installment payments to the Wilmington Trust Company prior to the repurchase of the automobile. A check in the amount of $100.00 drawn by Matthews Amusement Company, dated March 6, 1959, and payable to Eastern Shore for machines purchased, was endorsed by Mr. Moor to pay for a personal expense at Valley Forge Military Academy. During the years 1958 and 1959, Mr. Moor loaned more cash to the businesses in which he maintained *96 an interest than the repayments he received in cash or in checks which he converted to cash. In 1958, such figure amounted to $1,000.00, and in 1959, it amounted to $2,850.00. Mr. Moor's actual adjusted gross income was as follows during each of the years at issue: 15 Year
Adjusted Gross Income 1957
$50,337.92
1958
47,319.67
1959
34,809.76
Delmarva was in the business of operating coin amusement, cigarette, and other vending machines. During the period beginning October 31, 1957, and ending December 31, 1960, all capital invested in Delmarva was provided by Mr. Moor. However, during the fiscal year ended October 31, 1958, the secretary of Delmarva and the general manager responsible for the daily operation of its business was Richard G. Stone. On November 15, 1957, Delmarva purchased the entire coin-operated machine business of of Brantley Realty Company, Inc., for the sum of $100,000.00. At such time, Delmarva was an inactive corporation named Eastern Shore Amusement Service, Inc.The $25,000.00 downpayment was paid to Brantley Realty Company, Inc., by Mr. Moor in the form of 4 checks. The first check, in the amount of $18,000.00, was drawn *97 on Mr. Moor's account in the Delaware Trust Company. The check was composed in part of the proceeds of a $12,000.00 loan obtained by Mr. Moor and his wife from the Delaware Trust Company on October 28, 1957. Delmarva repaid the full amount of principal and interest on Mr. Moor's loan from the Delaware Trust Company. The machines 16 purchased from Brantley Realty Company, Inc., were transferred to Delmarva as part of Mr. Moor's capital investment. Delmarva's return for the fiscal year ended October 31, 1958, was prepared by George N. Porter from information provided by Delmarva. In such return, Delmarva reported gross sales of $105,857.34, cost of goods sold of $40,377.18, deductions of $55,779.96, and taxable income of $9,700.20. In point of fact, the income of Delmarva was understated. During the taxable year at issue for Delmarva, it maintained accounts in the County Trust Company, Pocomoke City, Maryland, and the Calvin B. Taylor Banking Company, Berlin, Maryland. Total deposits in these accounts during such year amounted to $169,139.63, of which $36,823.50 was attributable to nonincome sources. In addition, Delmarva had other income which was either not reported *98 or not deposited. Such income was, in part, represented by cash disbursements of at least $4,819.28, and, in part, resulted from a check in the amount of $2,541.50 written by a third party to Cigarette Service Corporation at the request of Mr. Moor in payment for the use of equipment furnished by Delmarva. 17 For its taxable year ended October 31, 1958, Delmarva's cost of goods sold and deductions amounted to $106,420.90. Thus, its taxable income for such year was $33,256.01. In March 1965, Delmarva filed an amended return for the year at issue. In such return, Delmarva reported gross receipts of $142,976.30, cost of goods sold amounting to $33,337.98, total deductions of $98,030.46, and taxable income of $18,307.86. The investigation of Mr. Moor's tax liability commenced with a letter dated June 6, 1960. From June 23, 1960, through the end of such year, the activity in Mr. Moor's 9 checking accounts markedly decreased. During the course of the investigation, all requests for records were channeled to Mr. Moor's accountant. Although there was a delay in producing such records, the delay was attributable to the volume of records requested. The respondent found that *99 although the personal records of Mr. Moor were somewhat incomplete, such records were adequate, but that the records of Eastern Shore and Delmarva were both incomplete and inadequate. For example, with respect to Eastern Shore, of the 27 deposits made in 1957 in the account maintained in the Farmer's Bank under the name R. C. Moor, Sr., trading as Eastern Shore, none of the deposit slips was available. Each had to be 18 obtained from the records of the bank. Similarly, with respect to Delmarva, of the 92 deposits made in one of its accounts maintained in the County Trust Company, none of the deposit slips was available. The respondent, therefore, determined the taxable income of both petitioners on the basis of the bank deposit and cash expenditure method, with the addition of specific items. Mr. Moor was a heavy drinker during the years at issue, and it was not uncommon for him to consume at least one fifth of alcohol a day during such period. During the course of the respondent's investigation, Mr. Moor's drinking increased to the point where it became detrimental to his health. In 1963, he suffered a heart attack and was hospitalized for a period of 2 months. By 1967, *100 he developed cirrhosis of the liver and diabetes. On June 29, 1965, Mr. Moor was indicted in the Federal district court for the district of Delaware for the willful attempt to defeat and evade the joint Federal income taxes of himself and his wife for the years 1957 through 1959 in violation of section 7201, and for willfully making and subscribing false Federal income tax returns for the years 1957 through 1959 in violation of section 7206(1). On July 8, 1965, Mr. Moor entered a plea of not guilty, but on January 26, 1967, he changed 19 his plea to nolo contendere on the charge of willful attempt to defeat and evade the Federal income taxes for the year 1957. Such plea was accepted by the court, which stated, in part, that the plea "was based not so much on an admission of guilt as fear on the part of * * * [Mr. Moor's] family and * * * attorney that * * * [his] health might not withstand a four or five week criminal trial." The other counts in the indictment were dismissed. With respect to both Mr. Moor and Delmarva, the notices of deficiency were dated November 22, 1968. OPINION Since the respondent concedes that Mrs. Moor is not liable for any part of the deficiencies *101 or for the addition to tax, and since the parties have agreed on the computation of the amount of the deficiencies, the only issue for us to decide is whether any part of the underpayment of taxes for each of the years 1957, 1958, and 1959 by Mr. Moor, and for the fiscal year ending October 31, 1958, by Delmarva, was due to fraud. Mr. Moor and Delmarva take the position that they are not liable for the additions to tax for fraud, and that they are not liable for the deficiencies because the statute of limitations had run prior to the mailing of the notices of deficiency. 20 Section 6653(b) provides that if any part of an underpayment of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment. Section 6501(c) (1) provides that "[in] the case of a false or fraudulent return with the intent to evade tax, the tax may be assessed * * * at any time." In the absence of fraud, the statute of limitations is a bar to the *102 assessment and collection of the deficiencies against Mr. Moor and Delmarva. Sec. 6501(a). The respondent contends that, with respect to Mr. Moor, the consistent failure to report substantial income over a 3-year period, the failure to keep adequate records, and the failure to provide his accountant with records reflecting all income amounted to fraud in each of the years at issue. With respect to Delmarva, the respondent contends that the facts are similar to those pertaining to Mr. Moor and Eastern Shore. There was a substantial understatement of income, resulting from an understatement of gross receipts, and inadequate records. Because Mr. Moor was a 100-percent shareholder of Delmarva, the respondent argues such similarities were not fortuitous, but rather reflect a similar intent to evade tax. On the other hand, both Mr. Moor and Delmarva contend that the respondent has not demonstrated fraud by 21 clear and convincing evidence. Mr. Moor claims he had no intent to defraud.He alleges that he had no knowledge of accounting, had but a limited education, was a hard worker, and drank alcohol to excess. He thus claims to have relied, justifiably, on his bookkeeper and *103 accountant to report income. Delmarva contends that the understatement of income, though substantial, was for only one year and resulted from inadvertence and mistake. Further, it contends that it cannot be held accountable merely because Mr. Moor owned 100 percent of the stock. We have given consideration to all the relevant evidence in the record and, on the basis of such consideration, find that, with respect to Mr. Moor, part of each underpayment of tax at issue was clearly due to fraud. However, with respect to Delmarva, the respondent has failed to demonstrate fraud by clear and convincing evidence. Fraud is an actual, intentional wrongdoing, and the intent required is the specific purpose to evade a tax believed to be owing. Mitchell v. Commissioner, 118 F.2d 308, 310 (C.A. 5, 1941), revg. 40 B.T.A. 424 (1939), supplemental opinion 45 B.T.A. 822 (1941); see also Cefalu v. Commissioner, 276 F.2d 122, 128-129 (C.A. 5, 1960), affg. a Memorandum Opinion of this Court; Ross Glove Company, 60 T.C. (July 23, 1973). Fraud is *104 never to 22 be presumed, but must be proved by clear and convincing evidence. James Nicholson, 32 B.T.A. 977, 989 (1935), affd. 90 F.2d 978 (C.A. 8, 1937); see also Cirillo v. Commissioner, 314 F.2d 478, 482, (C.A. 3, 1963), affg. in part a Memorandum Opinion of this Court; W. A. Shaw, 27 T.C. 561, 569 (1956), affd. 252 F.2d 681 (C.A. 6, 1958); Arlette Coat Co., 14 T.C. 751 (1950). However, establishing fraud by direct proof of intention is seldom possible. Usually, it is gleaned from the several transactions and the conduct of the taxpayer relative thereto. M. Rea Gano, 19 B.T.A. 518 (1930). The mere failure to report income, considered alone, is not fraud. James Nicholson, supra at 989; see also Jenkins v. United States, 313 F.2d 624, 628 (C.A. 5, 1963); Anderson v. Commissioner, 250 F.2d 242, 249-250 (C.A. 5, 1957), affg. on this issue a Memorandum Opinion of this Court, cert. denied 356 U.S. 950 (1958). Nevertheless, a consistent failure to report substantial amounts of income over a period of years is effective evidence *105 of fraud. Schwarzkopf v. Commissioner, 246 F.2d 731 (C.A. 3, 1957), affg. a Memorandum Opinion of this Court; Estate of Millard D. Hill, 59 T.C. 846 (1973); Jacob D. Farber, 43 T.C. 407, 419 (1965), supplemental opinion 44 T.C. 408 (1965); Estate of W. Y. Brame, 25 T.C. 824 (1956), 23 affd. per curiam 256 F.2d 343 (C.A. 5, 1958); cf. Holland v. United States, 348 U.S. 121, 139 (1954). Such repeated omissions, accordingly, are not mere omissions. Moreover, where such omissions result from a failure to keep adequate records and a failure to disclose adequate information to the accountants preparing the returns, the indication of fraud is strengthened. William H. Parsons, 43 T.C. 378, 395 (1964). With respect to Mr. Moor, it is clear that he failed to report more than $83,000 of gross income over a 3-year period - $38,421.25 for 1957, $33,712.02 for 1958, and $11,763.15 for 1959. The consistent and repeated omission of such substantial amounts of income constitutes, without more, persuasive evidence of fraud. However, there is considerably more evidence of fraud. *106 Eastern Shore reported its income in accordance with the bank deposit method of accounting. Under such method, gross receipts were determined by adding bank deposits to cash expenditures, with an adjustment for nonincome items. The reliability of such method depends upon a full disclosure of all deposits and all cash disbursements, but in this case, not all deposits, nor all cash disbursements, were disclosed. Although two bank accounts were maintained in the name of Eastern Shore, the accountant was provided 24 information about only one of the accounts. Substantial deposits were made in the other account, the Odessa account, and those deposits were not taken into consideration in computing gross receipts since the accountant was unaware of them. Moreover, substantial amounts of the gross receipts from the business of Eastern Shore were deposited in at least three accounts maintained by Mr. Moor in his own name. Similarly, some checks which represented gross receipts of Eastern Shore were not reflected in its income, because the checks were never deposited. For example, in 1959, a check payable to Eastern Shore for machines purchased was endorsed by Mr. Moor and diverted *107 to pay for a personal expense. Finally, personal expenses of Mr. Moor were paid by cash from collections or by money orders purchased with such cash, and incomplete records of such payments were kept, with the result that the accountant was not informed of such cash disbursements. These circumstances demonstrate that the repeated omissions of income were not due to mere negligence; they reveal a deliberate failure to disclose all income. Moreover, the facts contain numerous illustrations of the diversion of unreported business income to personal use. Funds from the Odessa account of Eastern Shore were used to pay Mr. Moor's personal Federal and State 25 income taxes. Although Cigarette Service Corporation made the installment payments on the purchase of the Porsche, Mr. Moor received all the proceeds from the sale of the automobile and used them to purchase an automobile for his wife. The facts of the case also indicate that Mr. Moor did not report all of his income. A specific example of income not reported was the net amount paid to him as a result of the winnings of the race horse owned by him. Moreover, he reported only his share of the income of Eastern Shore. He *108 was involved in many other businesses, and the unexplained bank deposits attributable to income may have been derived from such other businesses. Mr. Moor is not relieved of the responsibility for his conduct by his claimed reliance upon the bookkeeper and the accountant. See, e.g., Rau's Estate v. Commissioner, 301 F.2d 51 (C.A. 9, 1962), affg. a Memorandum Opinion of this Court, cert. denied 371 U.S. 823 (1962); Hicks Co., 56 T.C. 982, 1026-1027 (1971); William H. Parsons, 43 T.C. at 395; M. Rea Gano, 19 B.T.A. at 533-534. The records of deposits and expenditures were maintained in the offices of Eastern Shore, and the bookkeeper did not attend to the records more frequently than one afternoon per week. Moreover, he did not deposit the gross receipts of Eastern Shore in the 26 personal accounts of Mr. Moor, and although he may have been aware of such practice, it has not been shown that he made the decision to keep the accounts and records hidden from the accountant. Furthermore, the accounts remained active and receipts were deposited in such accounts well after the bookkeeper left Mr. Moor's employ, and *109 such activity did not subside until the respondent's investigation commenced in 1960. Finally, the accountant apparently acted in reliance upon the information furnished him, and therefore, he is not responsible for the failure to report all the income. Nor does Mr. Moor's drinking relieve him of responsibility for his conduct. Although he may have regularly consumed excessive amounts of alcohol and may have been intoxicated frequently, the record contains no evidence of other unstable behavioral patterns. Compare Robert P. Lord, 60 T.C. 199 (1973). During the years at issue, Mr. Moor was an active businessman who participated in numerous business ventures and successfully ran Eastern Shore. Although he claimed that because of his drinking, he was unaware of the amount of income being earned by his businesses, we find it difficult to accept such a statement; it is hard to understand how a man could operate successfully a number of businesses without being aware of whether he was earning a profit. Moreover, Mr. 27 Moor's drinking problem did not develop into a serious medical problem until after the years at issue. It may be that such problem served to mitigate *110 the effect of his plea of nolo contendere in the criminal proceedings. However, we have determined the existence of fraud without considering such plea, and therefore, there is no need to consider the mitigating effect arising from Mr. Moor's physical condition. With respect to Delmarva, there were no hidden bank accounts, and there is no allegation that an understatement of a substantial amount of income existed over a number of years. It is true that Delmarva understated gross receipts and maintained records that were incomplete and inadequate, and that the amount of taxable income not reported exceeded $23,000. However, such factors, standing alone, merely indicate an omission of income due to negligence or ignorance of the tax law, neither of which amounts to fraud. Mitchell v. Commissioner, 118 F.2d at 310; E. S. Iley, 19 T.C. 631 (1952). Moreover, although Mr. Moor was the sole stockholder of Delmarva, he did not take part in the conduct of its business; such business was managed by Mr. Stone. 28 Thus, no inferences as to the reason for Delmarva's understatement of income can be drawn from Mr. Moor's fraudulent failure to report all his *111 income. Decision will be entered under Rule 50 in docket No. 731-69. Decision will be entered for the petitioner in docket No. 732-69. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954. ↩