IKHOON CHANG AND SOON HEE CHANG, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Chang v. Commissioner
Docket No. 12880-80.
United States Tax Court
T.C. Memo 1984-259; 1984 Tax Ct. Memo LEXIS 415; 48 T.C.M. (CCH) 99; T.C.M. (RIA) 84259; May 14, 1984. Ray O. Womack, for the petitioners. Alvin B. Sherron, for the respondent. WILES
MEMORANDUM FINDINGS OF FACT AND OPINION WILES, Judge: Respondent determined the following deficiencies in, and additions to, petitioners' Federal income taxes: Addition to Tax
Year
Deficiency
Sec. 6653(b) [1]
1974
$2,325.47
$1,162.73
1975
6,812.71
3,406.35
1976
4,481.05
2,240.52
After concessions, the issues for decision are: (1) Whether petitioners underreported their taxable income for each of the years in issue; (2) whether petitioners are liable for the fraud addition to tax pursuant to section 6653(b) for each of the years in issue; (3) whether *417 the statute of limitations bars assessment and collection of the deficiencies determined for petitioners' 1974 and 1975 taxable years; and (4) whether petitioners are liable for the self-employment tax determined by respondent. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Ikhoon Chang (hereinafter petitioner) and Soon Hee Chang (hereinafter collectively referred to as petitioners), husband and wife, resided in Diamond Bar, California, when they filed their petition in this case. Petitioners timely filed their joint Federal income tax returns for 1974, 1975, and 1976 with the Internal Revenue Service Center, Fresno, California. Petitioner is a Korean licensed pharmacist who, from 1960 to 1964, ran a drug store near Seoul, South Korea. Petitioner's father owned the building that housed the drug store and had given petitioner money to start the business. In 1964, petitioner sold the drug store and the sale proceeds were paid to petitioner's parents who subsequently loaned the money for profit to various individuals in Korea. In 1964, petitioners moved to the United States. For three years, petitioner studied chemistry at the University *418 of Minnesota before moving to California. In California, petitioner studied to become a medical technologist, and was hired by Geleris-Harris Laboratory as a laboratory technologist. Petitioner continued to work at the Geleris-Harris Laboratory throughout the years in issue. During 1971, petitioners acquired the equipment and fixtures of a restaurant in Riverside, California, for a total of $17,500, toward which petitioners made a $5,000 downpayment. Petitioners opened the restaurant under the name "Michael's Restaurant" (hereinafter referred to as Michael's). Michael's was open six days a week from approximately 7:00 a.m. to 10:00 p.m. Generally, petitioner worked from 6:00 a.m. to 3:00 p.m. at Geleris-Harris Laboratory, and then he went directly to Michael's to work until closing. At Michael's petitioner performed whatever tasks were necessary to insure smooth operation of the restaurant, and he materially participated in the management of the restaurant. Mrs. Chang primarily worked in the kitchen assisting the cook and prkeparing meals when the cook was off duty. Major management decisions were generally made by petitioners together, including the purchase of the restaurant, *419 firing of the first manager, and creating promotional ideas to attract more customers. Petitioners never owned or worked in a restaurant before they purchased Michael's, and neither petitioner had accounting or bookkeeping experience. After purchasing Michael's, petitioners hired Virginia P. Chapman, an accountant, and her husband, who was a CPA, to do their accounting work. [2] Mr. Chapman established the accounting system used for Michael's, including a cash disbursement journal that made a carbon copy of each check written. Mrs. Chang maintained the cash disbursement journal as well as the daily sales records. Mrs. Chapman used the daily sales and expense records to report monthly sales receipts and cash disbursements in a general ledger. One difficulty Mrs. Chapman had in maintaining the books and records of Michael's income and expenses was that petitioners did not deposit their daily sales less daily expenses into their bank account intact. In fact, petitioners frequently deposited Mr. Chang's payroll check from the laboratory into Michael's account, and petitioners failed to maintain a clear distinction between funds used for Michael's and funds used for their personal *420 benefit. In working with the cash disbursement journal, Mrs. Chapman would allocate expenses according to information provided by Mrs. Chang. During 1975, petitioners wrote several checks to Fireside Thrift. Initially, Mrs. Chapman charged these checks to insurance; however, when a third check to Fireside Thrift was marked "equipment," Mrs. Chapman called Mrs. Chang and inquired as to the appropriate nature of this expense. Mrs. Chang told Mrs. Chapman that petitioners had a $10,000 equipment loan from Fireside Thrift and thereafter Mrs. Chapman charged the checks written to Fireside Thrift toward the purchase of equipment. In fact, the payments to Fireside Thrift were deposited to a savings account. Mrs. Chapman prepared petitioners' 1974, 1975, and 1976 tax returns using information provided by petitioners as well as the general ledger she maintained. In preparing petitioners' 1974 and 1975 returns, Mrs. Chapman routinely asked petitioners whether they had interest income and petitioners denied having interest income for either year. Consequently, no interest income was reported on petitioners' 1974 and 1975 income tax returns *421 despite the fact that they had savings account balances totaling $1,885.83, and $17,916.25, respectively, during 1974 and 1975. In July 1976, Internal Revenue Agent Peter E. Solberg commenced an investigation into petitioners' 1974 tax return. At a meeting on August 2, 1976, Solberg reviewed all of petitioners' records that were in Mrs. Chapman's possession. [3] Following this examination Solberg requested specific additional information to be provided at a second meeting. On August 27, 1976, a second meeting was held at Mrs. Chapman's office during which petitioners provided Solberg with duplicate copies of several bank statements, but they failed to provide copies of all of petitioners' personal bank accounts, as well as some of the business bank accounts. [4]
On September 13, 1976, Solberg expanded his audit to petitioners' 1975 taxable year *422 because there were unexplained deposits during 1974. Eventually, Solberg's investigation was also expanded to include petitioners' 1976 taxable year. During the course of his investigation, Solberg repeatedly asked for documentation relating to savings accounts, and petitioners repeatedly either denied that they had savings accounts or, if an account existed, maintained that they were unable to obtain copies of the bank statements. From the records provided, Solberg believed that petitioners had unreported income for each of the years in issue, predominantly in the form of unexplained deposits to various savings accounts. Petitioners told Solberg that the unexplained deposits results from substantial cash gifts from petitioner's father in Korea. Initially, petitioners were very vague with respect to the amounts received from Korea, but during a meeting in May 1977, they produced a record indicating the following specific amounts had allegedly been smuggled [5] into this country during 1974 and 1975: Date
Amount
Transported By
May 1974
$ 4,000
Visitors
August 1974
1,500
Visitors
October 1974
4,000
Soon Hee Chang
February 1975
4,500
Ikhoon Chang
May 1975
3,000
Visitors
September 1975
4,000
Visitors
$21,000
*423 During the course of the May 1977 meeting, petitioners further advised Solberg that during 1976 the only money they received from Korea was a $400 gift from Mrs. Chang's mother. In a subsequent meeting approximately two weeks later, Solberg asked Mrs. Chang about several large deposits made during September, November, and December, 1976, and Mrs. Chang replied that they resulted from $15,000 that petitioners had received from Korea during 1976. Solberg sought to verify petitioners' story by correlating the dates petitioners were in Korea with both the dates they allegedly received cash from Korea and the deposits to petitioners' savings accounts. Petitioners' passports indicated that Mr. Chang had been admitted to Korea for two weeks during January 1976 and that Mrs. Chang had been admitted to Korea for approximately one month between June and July of 1976, but that neither petitioner had returned from Korea at or near the time that the large deposits were made to petitioners' savings accounts. As a result of his investigation, *424 Solberg referred his examination of the Change's 1974, 1975, and 1976 tax years to the Criminal Investigation Division. Following this referral, Special Agent Kenneth Yarbrough and Internal Revenue Agent Floyd Kreitz investigated petitioners' 1974, 1975, and 1976 tax returns. Revenue Agent Kreitz reconciled Michael's books of account with the tax returns, and no discrepancies were discovered; however, Yarbrough's reconstruction of petitioners' net worth showed that their net worth increased (decreased) by ($3,312.50), [6] $29,068.14, and $17,253.28, respectively during 1974, 1975, and 1976. Petitioners have stipulated, with minor adjustments, to the accuracy of Yarbrough's reconstruction of their net worth, but insist that the increase in net worth is derived predominantly from monies received from Korea. [7]
*425 The following chart shows petitioners' reported taxable income, and the taxable income determined by respondent according to the increases in petitioners' net worth for each year in issue: Taxable Income Determined By
Year
Reported Taxable Income
Respondent's Net Worth Analysis
1974
($612.92)
$9,104.78
1975
4,630.07 33,574.15
1976
14,222.07 25,730.13
In the notice of deficiency, respondent determined that the increases in petitioners' net worth were derived from taxable sources, and accordingly respondent increased petitioners' taxable income by $9,717.70, $28,944.08, and $11,508.06 for the taxable years 1974, 1975, and 1976, respectively. [8] Moreover, respondent determined that all or part of the underpayment of tax required to be shown on the returns for 1974, 1975, and 1976 was due to fraud. *426 OPINION The first issue for decision is whether petitioners underreported their taxable income for each of the years 1974, 1975, and 1976. Respondent reconstructed petitioners' income for each year in issue using the net worth analysis and the parties have stipulated, with minor adjustments, to the accuracy of respondent's net worth analysis. The issue, therefore, turns not on the accuracy of respondent's computations, but on whether the increase in petitioners' net worth was derived from nontaxable gifts, as petitioners contend, or on whether the increase was derived from taxable receipts produced by petitioners' operation of Michael's, as respondent contends. Before reaching the source issue, however, a threshold question is whether assessment of the deficiencies for 1974 and 1975 is barred by the statute of limitations. Petitioners contend that the notice of deficiency was mailed more than three years after their 1974 and 1975 tax returns were filed, and therefore assessment of any deficiencies is barred by the general three-year statute of limitations. Section 6501(a). Respondent, on the other hand, contends that the deficiencies may be assessed at any time because petitioners *427 have filed false and fraudulent returns with intent to evade tax. Section 6501(c)(1). For respondent to prove the applicability of section 6501(c)(1) false return exception to the three-year statute of limitations, he must establish that petitioners acted fraudulently within the meaning of section 6653(b). Estate of Temple v. Commissioner,67 T.C. 143, 159-160 (1976). To carry his burden of proof, respondent must establish by clear and convincing evidence for each of the years in issue that there was an underpayment of tax and that some part of each underpayment was due to fraud. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure; Hebrank v. Commissioner,81 T.C. 640 642 (1983). Petitioners have stipulated that their net worth increased during each of these years in amounts substantially in accordance with respondent's determination. The sole issue, therefore, is the likely source of this money. See Holland v. United States,348 U.S. 121 (1954). Petitioners maintain that the increase in their net worth came almost exclusively from gifts from petitioner's father who lived in Korea and which were derived *428 from the sale proceeds of petitioner's drug store. Respondent maintains that the increases in net worth were due solely to unreported taxable income derived from Michael's. For calendar years 1974 and 1975, we hold that respondent has met his burden of establishing that petitioners underpaid their taxes. Respondent has successfully negatived petitioners' claimed receipt of gifts from Korea. Upon receiving information regarding alleged gifts from Korea, respondent requested that petitioners provide him with the dates, amounts, and names of the people who brought the money into the country. Respondent's subsequent review of petitioners' passports indicated that petitioners had not returned from Korea on the dates they allegedly brought money back from Korea. Moreover, respondent investigated petitioners' savings accounts, and amply demonstrated that there were no large deposits to petitioners' bank accounts on or near the dates that they allegedly received funds from Korea. This lack of correlation between the dates on which petitioners allegedly received large sums from Korea and the dates on which petitioners actually were in Korea, as well as the lack of substantial deposits *429 on or near the dates on which the funds were allegedly received, convinces us that the likely source of the increase in their net worth was from Michael's. See Holland v. United States,supra;United States v. Massei,355 U.S. 595 (1958). [9] Having found underpayments in 1974 and 1975, the question now becomes whether any part of these underpayments was due to fraud. A charge of fraud is not to be taken lightly and is never to be presumed. The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner,67 T.C. 181, 191 (1976), affd. without published opinion 578 F. 2d 1383 (8th Cir. 1978). Respondent has the burden of proving fraud, for each year that it is alleged, by clear and convincing evidence. Section 7454(a); Rule 142(b), Tax Court Rules of Practice and Procedure. The taxpayer must be shown to have acted with a specific intent to evade a tax believed to be owed by conduct intended to conceal, mislead, or otherwise prevent the collection thereof. Stoltzfus v. United States,398 F. 2d 1002, 1004 (3d Cir. 1968); *430 Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court; Acker v. Commissioner,26 T.C. 107, 112-113 (1956). Since direct evidence of fraud is seldom available, respondent may meet his burden of proof through circumstantial evidence. Nicholas v. Commissioner,70 T.C. 1057, 1065 (1978). Upon careful examination of the entire record, the evidence establishes that petitioners fraudulently underpaid their taxes during 1974 and 1975. Among other things, petitioners denied the existence of undisclosed savings accounts to respondent's agents, and they specifically denied the existence of interest income to their return preparer during either 1974 or 1975 when they had interest bearing savings accounts totaling $1,885.83 and $17,916.25, respectively. This conduct was designed to mislead respondent's agents and to conceal income and is an indication of fraud. Estate of Upshaw v. Commissioner,416 F. 2d 737, 741 (7th Cir. 1969), affg. a Memorandum Opinion of this Court; McGee v. Commissioner,519 F. 2d 1121, 1126 (5th Cir. 1975), affg. 61 T.C. 249 (1973). *431 Petitioners also attempted to mislead respondent's agents by maintaining that the majority of the increase in their net worth was due to gifts from Korea, and by changing their story with respect to the amount received throughout respondent's investigation. See McGee v. Commissioner,supra.
Further evidence of petitioners' intent to conceal income and evade taxes is evidenced by their statement to Mrs. Chapman that checks written to Fireside Thrift were in repayment of a $10,000 equipment loan, when in fact these payments were being deposited to a savings account on which the interest income was not reported. See Farber v. Commissioner,43 T.C. 407 (1965). On these facts, we hold that respondent has proven that petitioners committed fraud during 1974 and 1975. Therefore, the statute of limitations does not bar assessment of the deficiencies and petitioners are liable for the fraud addition to tax. Sec. 6653(b), sec. 6501(c)(1). While respondent has proven petitioners' fraudulent intent to evade tax within the meaning of section 6653(b) for taxable years 1974 and 1975, he still must prove fraud for petitioners' taxable year 1976. On *432 brief, petitioners have admitted that even if their explanation of nontaxable gifts from Korea were accepted, the increase in net worth to which they have stipulated indicates that they have unreported taxable income from the operation of Michael's restaurant during 1976. This failure to report income earned by Michael's during 1976 is an indicium of fraud. Moreover, the fact that petitioners failed to disclose this additional income from Michael's to Mrs. Chapman is further evidence of an intent to conceal income and evade taxes. Farber v. Commissioner,supra.Petitioners' concealment of income, and failure to provide respondent's agents with documentation regarding several of their savings accounts evidence a clear intent to evade tax during 1976. See McGee v. Commissioner,supra.
On these facts, we hold that respondent has established, by clear and convincing evidence, that petitioners are liable for the fraud addition to tax for 1976. Finally, we must decide whether petitioners are liable for the self-employment tax determined by respondent. Because we have found underpayments and that petitioners committed fraud as to some parts *433 of such underpayments for each of the years in issue, the statute of limitations no longer bars assessment of the deficiencies for 1974 and 1975, and petitioners bear the burden of proving that respondent's determination is incorrect. [10]Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure.
Section 1401(a) imposes a tax on the "self-employment income of every individual." Section 1402(b) defines the term "self-employment income" as the "net earnings from self-employment which is in excess of * * * the contribution and benefit base [11] * * * minus * * * the amount of wages paid to such individual during such taxable years." Section 1402(a), in pertinent part, provides that: (5) if-- (A) any of the income derived from a trade or business (other than a trade or business carried on by a partnership) is community income under community property laws applicable to such income, all of the gross income and deductions attributable to such trade or business shall be treated as the gross income and deductions of the husband unless the wife exercises substantially *434 all of the management and control of such trade or business, in which case all of such gross income and deductions shall be treated as the gross income and deductions of the wife[.] See sec. 1.1402(a)-8(a), Income Tax Regs.
Since California is a community property state, [12] pursuant to section 1402(a), all of the gross income and deductions attributable to Michael's must be treated as belonging to petitioner unless Mrs. Chang exercised "substantially all" of the management and control. Throughout the years in issue, Mrs. Chang's primary duty was to work in the kitchen assisting the cook and preparing meals when the cook was off duty. Virtually every management decision was made either by petitioner or by both petitioners together, including the purchase of the restaurant, firing of the first manager, and creating promotional ideas to attract more customers. Under these circumstances, Mrs. Chang clearly did not exercise substantially *435 all of the management and control of Michael's and all of the income and deductions attributable thereto must be treated as belonging to petitioner for purposes of computing his self-employment tax liability. Since respondent computed petitioners' self-employment tax liability on the maximum contribution and benefit base for each year in issue without first deducting therefrom petitioner's wages from Geleris-Harris Laboratories, a Rule 155 computation will be necessary. Cf. sec. 1.1402(b)-1(b)(2) and (3), Income Tax Regs.
To refelect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended.↩
2. Mr. Chapman died in October 1974.↩
3. Mrs. Chapman did not have all of the bank statements or canceled checks from the records in her possession, and she had no record of any savings accounts for the petitioners. ↩
4. Between 1974 and 1976, petitioners had approximately 35 savings accounts although only 10 to 12 of these accounts were active during any given year.↩
5. Throughout the years in issue it was apparently illegal for persons to take cash out of Korea in the amounts allegedly received by petitioners.↩
6. Petitioners' net worth decreased during 1974 because of additional liabilities incurred during that year. For convenience, however, we will refer to petitioners' 1974 net worth as an increase because, notwithstanding the additional liabilities, they in fact had a total net worth increase during that year which was in excess of that determined to exist according to their reported taxable income. ↩
7. Petitioners' alleged gifts from Korea during 1975 and 1976 are not sufficient to explain the stipulated increase in their net worth during those years, and on brief petitioners admit that the have unreported taxable income from the operation of Michael's during each of those years.↩
8. The parties have stipulated that petitioners received reimbursement for several nondeductible expenditures during 1975 and 1976, Included within the 1976 adjustments is a $300 contribution toward the cost of a fence that petitioners received from a neighbor during that year.
* resulting in the following smaller net worth increases for 1975 and 1976: ↩
Unreported Gain in
Year
Petitioners' Net Worth
1975
$25,451.51
1976
9,794.40
9. See also Catalanotto v. Commissioner,T.C. Memo. 1984-215↩.
10. Compton v. Commissioner,T.C. Memo. 1983-642↩.
11. The contribution and benefit base during 1974, 1975, and 1976 was $13,200, $14,100, and $15,300, respectively. Section 1402(b)(1)(H), (I); Section 230 Social Security Act, Pub. L. 92-336, 86 Stat. 417, 42 U.S.C. sec. 430↩.
12. Calif. Civ. Code sec. 161↩ (West 1954).